# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MR. DARRELL COMBS, and
MRS. KATHLEEN COMBS,
          Plaintiffs,
   v.

HOMER CENTER SCHOOL DISTRICT, and
JOSEPH F. MARCOLINE, in his official capacity as
Superintendent of Homer-City School District,

      Defendants.

**ELECTRONICALLY FILED**

**04cv1599 LEAD**
Consolidated for Purpose of Pretrial
Proceedings with 04-1670, 04-1932,
04-1936, 05-70(E), 05-203(J)

---

DR. THOMAS PREVISH AND
TIMARI PREVISH,
          Plaintiff,
   v.

NORWIN SCHOOL DISTRICT, and
RICHARD WATSON, in his official capacity as
Superintendent of Norwin School District,
          Defendants.

04cv1670

---

DR. MARK NEWBORN, and
MRS. MARY ALICE NEWBORN,
          Plaintiffs,
   v.

FRANKLIN REGIONAL SCHOOL
DISTRICT, and
STEPHEN VAK, in his official capacity as
Superintendent of Franklin Regional School District,
          Defendants.

04cv1932

---

MR. THOMAS HANKIN, and
MRS. BABETTE HANKIN,
         Plaintiffs,                      04cv1936
     v.

BRISTOL TOWNSHIP SCHOOL DISTRICT, and
REGINA CESARIO, in her official capacity
as Superintendent of Bristol Township School District,
         Defendants.

---

MR. DOUGLAS NELSON and
MRS. SHARI NELSON,
         Plaintiffs,                      05cv0070 (Erie)
v.

TITUSVILLE AREA SCHOOL DISTRICT, and
JOHN D. REAGLE, in his official capacity as
Acting Superintendent of Titusville Area School District,
         Defendant.

---

REV. STEVEN WEBER AND
MRS. MEG WEBER,
         Plaintiffs,                      05cv203 (Johnstown)
v.

DUBOIS AREA SCHOOL DISTRICT, and
SHARON KIRK, in her official capacity as
Superintendent of Dubois Area School District,
         Defendants.

**MEMORANDUM OPINION**

**May 25, 2006**

## I.  Introduction

### A. General Background

The Commonwealth of Pennsylvania's education system, enacted by its General Assembly (as opposed to the Pennsylvania Department of Education ("PDE") or local school boards or administrators), permits parents and guardians to satisfy Pennsylvania's compulsory education laws through "home education programs," subject to minimum days of attendance and hours of instruction in certain specific courses (e.g., language, geography, literature, history) and review by the respective school districts of logs and educational materials compiled by the supervisors of the home education programs for compliance with the required courses and minimum days and hours of instruction, but <u>not</u> of educational content, textbooks, curriculum or instructional materials.

Parents who home school their children based on their sincerely held religious beliefs have sued their respective school districts and superintendents in several state and federal courts in the Commonwealth of Pennsylvania, seeking a declaratory judgment and equitable relief from the enforcement of Pennsylvania's Compulsory Attendance Law through truancy prosecutions on the grounds that Pennsylvania's statute permitting "home education programs" violates the Pennsylvania Religious Freedom Protection Act, the Free Exercise, Establishment and Free Speech Clauses of the First Amendment to the Constitution of the United States, and several aspects of the Due Process Clause of Fourteenth Amendment to the Constitution of the United States, both "on its face" and "as applied."

## B. Procedural Background

On December 8, 2005, this Court entered an opinion and order (Document No. 84) denying the motion for summary judgment filed by Plaintiffs (parents who home school their children for religious reasons) addressed to their "facial" constitutional and statutory challenges to Defendant school districts' various home schooling programs implementing Pennsylvania's Home Schooling Act, Act 169, but left open the possibility that Plaintiffs "may be able to demonstrate that, as applied in practice, one or more of the Defendant school districts or superintendents applies Act 169 in such a way as to restrict or infringe upon their religious practice or exercise." *Combs v. Homer Center Sch. Dist.*, 2005 WL 3338885, at *29 (W.D.PA. 2005).

At the next status conference, on January 4, 2006, Plaintiffs could not identify any significant factual disputes regarding their "as applied" challenges to Act 169, but were not prepared, however, to concede that there were no genuine issues of material fact remaining regarding their "as applied" challenges.  Accordingly, the Court directed a second round of summary judgment motions and briefs, with Defendant school districts as the movants, addressed to the parents' remaining "as applied" challenges to the various home schooling programs. Defendants have filed their consolidated motion for summary judgment and concise statement of material facts (Documents Nos. 100, 101), Plaintiffs filed their response and memorandum of law in opposition thereto (Documents Nos. 103, 104), and Defendants have filed their reply brief (Document No. 108).  The matter is now ripe for disposition.  This memorandum opinion will set forth the Court's reasoning and disposition of both the "facial" and the "as applied" challenges to Act 169.

4

Resolution of the pending motion for summary judgment requires careful consideration and balancing of often competing personal, societal and governmental interests -- the rights of parents and guardians to direct the education and upbringing of their children and the constitutional and statutory obligation of the Commonwealth to provide for and ensure the adequate education of its children citizens -- and constitutional principles that are basic to our Nation's concept of ordered liberty and democracy.

## II. The Pennsylvania Constitutional and Statutory Framework

### A. Education in American History in General, and in the Commonwealth of Pennsylvania in Particular

### 1. American History

An educated citizenry has been recognized as critical to the success and well-being of the Nation and its people from the time of its creation.  Founding fathers, including George Washington, John Adams, Thomas Jefferson and, in the Commonwealth of Pennsylvania, William Penn, championed the view that the government has an overarching responsibility to create and to regulate a system of public education.

In his farewell address in 1796, America's first president, George Washington, addressed the issue of public education provided by the government.  "Promote then, as an object of primary importance, institutions for the general diffusion of knowledge. . . . In proportion as the structure of a government gives force to public opinion, it is essential that public opinion should be enlightened."[1]  John Adams agreed that the government was obligated to educate its citizens. In 1780, Adams engrafted that principle into the Massachusetts' Constitution, which stated: "[I]t

---

[1] The Avalon Project at Yale Law School, <u>Washington's Farewell Address 1796</u>, www.yale.edu/lawweb/avalon/washing.htm.

shall be the duty of the legislatures and magistrates, in all future periods of the Commonwealth, to cherish the interests of . . . public school and grammar schools in the towns."[2]

And, serving in Virginia's state legislature, Thomas Jefferson proposed legislation in the fall of 1778 to create a public school system in Virginia. Jefferson titled this measure A Bill for the More General Diffusion of Knowledge.[3] "For Thomas Jefferson, public education was the key to preserving republican government."[4] Jefferson believed every citizen should have access to public education because the "most effectual means of preventing [public corruption] would be, to illuminate, as far as practicable, the minds of the people at large."[5]

The Massachusetts Bay Colony was the first American colony to pass a compulsory education law. In 1642, Massachusetts required parents to see that their children received an education, and five years later, the legislature passed a law which established public schools in some towns, and provided for the appointment of teachers and collection of taxes to pay for the education of children.[6] Connecticut was the next colony to pass a public school law in 1650, requiring all "masters of families" to educate their children and servants.[7]

---

[2] Dave Wieneke, Education Time Line: 400 Years in Education, Mass. Gov. interactive website, www.mass.gov/statehouse/1700.htm.

[3] Thomas Jefferson Exhibits, www.loc.gov/exhibits/jefferson/jeffrep/html., United States Library of Congress website.

[4] Id.

[5] Id.

[6] Kern Alexander and M. David Alexander, American Public School Law, 22 (1998).

[7] Id.

2.      **Pennsylvania History**

Before any of these notables had placed their imprimaturs on public education as a

foundation of good government and a robust Nation, William Penn had advocated for a system of

public schools in Pennsylvania,[8] as did other prominent leaders of the Commonwealth.[9]  In 1681,

Penn was granted the colony by the King of England.  He drafted a <u>Frame of Government</u> for the

new Commonwealth, which included a provision for public education, stating: "Twelfth. That

the Governors and Provincial Council shall erect and order all Public Schools, and encourage and

reward authors of useful sciences and laudable inventions in the said Province."[10]

At Penn's urging, in 1682 the First General Assembly of Pennsylvania created the "Great

Law" which included a provision for the creation of schools across Pennsylvania.[11] Then, at the

Second General Assembly in 1683, stronger public school legislation was passed under Penn's

leadership. In Chapter CXII, this legislation stated:

> And to the end that poor as well as rich man be instructed in good and
> commendable learning, which is to be preferred before wealth, Be it

---

[8] The Avalon Project at Yale Law School, <u>Frame of Government of Pennsylvania, May 5, 1682</u>,  www.yale.edu/lawweb/avalon/states/pa04.htm.  <u>See generally</u> Louise Gilchrise Walsh and Matthew John Walsh, <u>History and Organization of Education in Pennsylvania</u>, 20-21, 40-45, 59 (1928).

[9] Benjamin Franklin and Benjamin Rush, for example.  James Pyle Wickersham, <u>A History of Education in Pennsylvania Private and Public, Elementary and Higher</u>, 58 (1886) (on Franklin's advocacy for public education); Alyn Brodsky, <u>Benjamin Rush Patriot and Physician</u>, 296 (2004) (Rush wrote an article in 1787 for the Philadelphia Independent Gazette entitled, "To the Citizens of Philadelphia: A Plan for Free Schools," which called for the creation of schools for all children no matter their age, social status, or religious background).

[10] Wickersham, at 33.

[11] <u>Id.</u>, at 38.

7

enacted, . . . [t]hat all persons in this Province and Territories thereof, having children, and all the guardians and trustees of orphans, shall cause such to be instructed in reading and writing . . . , and that then they be taught some useful trade or skill, that the poor may work to live, and the rich if they become poor may not want: of which every County court shall take care. And in case such parents, guardian, or overseers shall be found deficient in this respect, every such parent, guardian, or overseer shall pay for ever such child, five pounds, except there should appear an incapacity in body or understanding to hinder it.[12]

In 1776, the Commonwealth of Pennsylvania passed a provisional state constitution which included the following provision for public education: "A school or schools shall be established in each county by the legislature for the convenient instruction of youth, with such salaries to the masters paid by the public as may enable them to instruct youth at low prices; and all useful learning shall be duly encouraged and promoted in one or more Universities."[13]  In one form or another, provisions for public education were set forth in the various state constitutions, culminating in the formulation contained in the Pennsylvania Constitution of 1874, to wit: "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public schools, wherein all the children of this Commonwealth above the age of six years shall be educated, and shall appropriate at least one million dollars each year for that purpose." Pa. Const. of 1874, Art. X, § 1.  As amended in 1967, this proviso now reads: "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth."  Pa. Const., Art. III, § 14.

The Pennsylvania Constitution of 1790 was the basis for the Free Public School Act of

---

[12] Id., at 39.

[13] Id., at 256.

1834 which is the underpinning for today's system of schools in the Commonwealth. 22 Pa.

Code, Chap. 4, Appx. C, Academic Standards for Civics and Government, XIV.  "In meeting its

responsibility, the General Assembly has established a comprehensive legislative scheme

governing the operation and administration of public education." Pennsylvania Fed'n of Teachers

v. Sch. Dist. of Phila., 506 Pa. 196, 484 A.2d 751, 753 (1984).

The structure of Pennsylvania's public school system was summarized by the United

States Court of Appeals for the Third Circuit recently in  Parents United For Better Schools, Inc.

v. Sch. Dist. of Philadelphia Bd. of Educ., 148 F.3d 260, 262 n.1 (3d Cir. 1998):

> The organization of [Pennsylvania's] public school system is
> controlled by the Public School Code of 1949 (School Code)[24 Pa.
> Stat. Ann. §§ 1-101--27-2702 (West 1992) ]." Philadelphia Fed'n of
> Teachers, Local No. 3 v. Board of Educ. of the Sch. Dist. of Phila., 51
> Pa.Cmwlth. 296, 414 A.2d 424, 426 (1980) (citation omitted).
> "School Districts act as agencies of the state legislature in
> administering the educational program within the district."
> Chambersburg Area Sch. Dist. v. Pennsylvania Labor Relations Bd.,
> 60 Pa.Cmwlth. 29, 430 A.2d 740, 743 (1981) (citation omitted),
> appeal dismissed, 498 Pa. 366, 446 A.2d 603 (1982).  See also Barth
> v. School Dist. of Phila., 393 Pa. 557, 143 A.2d 909, 912 (1958) ("the
> School District of Philadelphia is an agent or creature of the
> Legislature");  Kaufman v. Central Susquehanna Intermediate Unit
> No. 16, 144 Pa.Cmwlth. 163, 601 A.2d 412, 414 (1991) ( "The
> legislature has established that each school district and intermediate
> unit shall have, inter alia, a board of directors and has set forth the
> powers and duties of each") (citation omitted).

The following laws were enacted to implement Pennsylvania's constitutional mandate to

provide a thorough and efficient system of public education to serve the needs of the citizens of

the Commonwealth. Pa. Const., Art. III, § 14.

**B.      Pennsylvania Compulsory Education Law and Four Legislative Educational Options**

The Commonwealth of Pennsylvania requires every child of compulsory school age having legal residence in Pennsylvania "to attend a day school in which the subjects and activities prescribed by the standards of the State Board of Education are taught in the English language." 24 Pa. Stat. Ann. §13-1327(a).  Compulsory school age is defined by the Pennsylvania Administrative Code as "the period of a child's life from the time the child enters school as a beginner which may be no later than at the age of eight (8) years, until the age of seventeen (17) or graduation from a high school, whichever occurs first."  22 Pa. Code §11.13 (2005).

The Pennsylvania legislature currently permits four alternative categories or types of education that may satisfy the Compulsory School Law: (1) public schools, with certain trade school options, 24 Pa. Stat. Ann. §13-1327(a); (2) non-public, licensed private academic schools, 24 Pa. Stat. Ann. §13-1327(a); (3) schools operated by bona fide churches or other religious bodies, 24 Pa. Stat. Ann. §13-1327(b); and (4) "home education programs," 24 Pa. Stat. Ann. §13-1327.1.

First, parents and guardians may fulfill the compulsory attendance requirements by sending their children to public schools.  In lieu of such attendance, any child who is fifteen years of age may enroll as a day student in a private trade school or in a private business school licensed by the Pennsylvania Department of Education provided he or she obtains the approval of the district superintendent and Secretary of Education. 24 Pa. Stat. Ann. §13-1327(a).  Similarly, any child sixteen years of age may enroll as a day student in a private trade school or in a private

business provided he or she obtains the approval of the district superintendent.  24 Pa. Stat. Ann.

§13-1327(a).  Thus, even though a child may opt to attend a private trade or business school,

every

> parent, guardian, or other person having control or charge of any child
> or children of compulsory school age is required to send such child or
> children to a day school in which the subjects and activities prescribed
> by the standards of the State Board of Education are taught in the
> English language.

24 Pa. Stat. Ann. §13-1327(a).

The second option enacted to ensure "appropriate education" of the children of the

Commonwealth is private schools.  The certificate of any principal or teacher of a private school,

or of any institution for the education of children, "in which the subjects and activities

prescribed" by the State Board of Education are taught in the English language, must set forth

that the work of said school is in compliance with the provisions of the Compulsory Attendance

Law. 24 Pa. Stat. Ann. §13-1327(a). With respect to instruction in the English language,

instruction by a properly qualified private tutor shall be considered as complying with the

Compulsory Attendance Law. 24 Pa. Stat. Ann. §13-1327(a).  A properly qualified private tutor

is defined as "any person who is certified by the Commonwealth of Pennsylvania to teach in the

public schools of Pennsylvania."  24 Pa. Stat. Ann. §13-1327(a).

The third alternative permits education at parochial and other religious affiliated schools

run by bona fide churches and other religious bodies.  The principal of each such school must

submit a notarized affidavit to the Pennsylvania Department of Education, stating that the

mandated subject matter is offered in the English language and that such school is otherwise in

compliance with the provisions of the Compulsory Attendance Law. 24 Pa. Stat. Ann. §13-

1327(b). Thus,

> a school operated by a bona fide church or other religion body and the
> parent, guardian or other person having control or charge of any such
> child or children of compulsory school age shall be deemed to have
> meet the requirements of this section if that school provides a
> minimum of one hundred eight (180) days of instruction or nine
> hundred (900) hours of instruction per year of instruction at the
> secondary level.

24 Pa. Stat. Ann. §13-1327(b).

Furthermore, a school operated by a bona fide church or religious body must provide

instruction in the following subjects at the elementary level:

> English, to include spelling, reading, and writing; arithmetic; science;
> geography; history of the United States and Pennsylvania; civic; safety
> education, including regular and continuous instruction in the dangers
> and prevention of fires; health and physiology; physical education;
> music; and art.

24 Pa. Stat. Ann. §13-1327(b)(1).

And at the secondary level, such schools must provide instruction in:

> English, to include language, literature, speech and composition;
> science, to include biology and chemistry; geography; social studies,
> to include civics, economics, world history, history of the United
> States and Pennsylvania; a foreign language; mathematics, to include
> general mathematics and statistics, algebra and geometry; music;
> physical education; health and physiology; and safety education,
> including regular and continuous instruction in the dangers and
> prevention of fires.

24 Pa. Stat. Ann. §13-1327(b)(2).

Although the subject areas to be taught in schools operated by a bona fide church or

religious body are prescribed by statute, it is "the policy of the Commonwealth to preserve the

primary right and the obligation of the parent or parents, or person or persons in loco parentis to a

12

child, to choose the education and training for such child."  24 Pa. Stat. Ann. §13-1327(b).

Accordingly, nothing contained in the Compulsory Attendance Law "shall empower the

Commonwealth, any of its officers, agencies or subdivisions to approve the course content,

faculty, staff or disciplinary requirements of any religious school referred to in this section

without the consent of said school."  Id.

### C.      Act 169 of 1988 - Pennsylvania Home Schooling Act

The Pennsylvania legislature recognized and permitted the fourth alternative in 1988 –

Pennsylvania's Home Schooling Act, Act 169 of 1988, P.L. 1321, No. 169, December 1, 1988,

24 Pa. Stat. Ann. §13-1327.1.  Act 169 provides that instruction to children of compulsory school

age in a "home education program" satisfies Compulsory Attendance Law. 24 Pa. Stat. Ann. §13-

1327.1(d). Act 169 requires the same number of days and hours of instruction, and the same

subject matters of instruction as required by a school operated by a bona fide church or religious

body.  24 Pa. Stat. Ann. §13-1327.1(c)(1)(2).  To begin a home education program, the parent or

guardian of the child must file a notarized affidavit prior to the commencement of the home

education program, and annually thereafter on August 1, with the superintendent of the school

district of residence. 24 Pa. Stat. Ann. §13-1327.1(b)(1). This affidavit must set forth:

> [T]he name of supervisor of the home education program who shall be responsible
> for the provision of instruction; the name and age of each child . . . ; the address
> and telephone number of the . . . site; that such subjects as required by law are
> offered in the English language, including an outline of proposed education
> objectives by subject area.

24 Pa. Stat. Ann. §13-1327.1.

The outline of proposed education objectives cannot be utilized by the district

superintendent in determining whether the home education program is in compliance. 24 Pa. Stat.

Ann. §13-1327.1(b)(1). However, the superintendent is charged with ensuring that "appropriate

education" is taking place; "appropriate education" is "a program consisting of instruction in the

required subjects for the time required in this act and in which the student demonstrates sustained

progress in the overall program." 24 Pa. Stat. Ann. §13-1327.1(a).

In order to ensure that "appropriate education" is occurring, the supervisor of the home

education program must submit to the district superintendent a portfolio of records and materials,

as follows:

> (1) A portfolio of records and materials. The portfolio shall consist of a log, made
> contemporaneously with the instruction, which designates by title the reading materials
> used, samples of any writings, worksheets, workbooks or creative materials used or
> developed by the student and in grades three, five and eight results of nationally normed
> standardized achievement tests in reading/language arts and mathematics or the results of
> Statewide tests administered in these grade levels. The department shall establish a list
> . . . of nationally normed standardized tests from which the supervisor . . . shall select . . .
> if the supervisor does not choose the Statewide tests. At the discretion of the supervisor,
> the portfolio may include the results of nationally normed standardized achievement tests
> for other subject areas or grade levels. The supervisor shall ensure that the nationally
> normed standardized tests or the Statewide tests shall not be administered by the child's
> parent or guardian.

> \*   \*   \*

> (2) An annual written evaluation of the student's educational progress as
> determined by a licensed clinical or school psychologist or a teacher certified by the
> Commonwealth or by a [qualified] nonpublic school teacher or administrator. . . . The
> evaluation shall also be based on an interview of the child and a review of the portfolio
> required in clause (1) and shall certify whether or not an appropriate education is
> occurring. At the request of the supervisor, persons with other qualifications may conduct
> the evaluation with the prior consent of the district of residence superintendent. In no
> event shall the evaluator be the supervisor or their spouse.

24 Pa. Stat. Ann. §13-1327.1(e)(1)(2).

If at any time during the school year, the district superintendent has a reasonable belief

that appropriate education may not be occurring in a home education program, the superintendent

may require documentation pertaining to the portfolio of records and materials to be submitted. 24 Pa. Stat. Ann. §13-1327.1(h). After reviewing the submitted documentation, if the district superintendent believes that appropriate education is not taking place, either during or at the conclusion of the school year, he or she shall notify the supervisor of the home education program by certified mail, stating such belief and specifying the aspects of the documentation deemed inadequate. 24 Pa. Stat. Ann. §13-1327.1(i). The supervisor of the home education program shall then have twenty (20) days to submit additional documentation demonstrating that appropriate education is occurring. 24 Pa. Stat. Ann. §13-1327.1(j). If this additional documentation is not forwarded to the district superintendent, the home education program will be declared out of compliance, and as a consequence, the child must be "enrolled in the public school district of residence or a nonpublic school or a licensed private academic school," and the supervisor or spouse of the supervisor shall not be eligible to supervise a home education program for that child for twelve months. 24 Pa. Stat. Ann. §13-1327.1(j).

If additional documentation is submitted and the district superintendent still determines that appropriate home education is not occurring, he must notify the supervisor of the home education program and the board of school directors must then provide for a "proper hearing by a duly qualified and impartial hearing examiner within thirty days." 24 Pa. Stat. Ann. §13-1327.1(k). The hearing examiner "shall not be an officer, employee or agent of the PDE or of the school district or intermediate unit of residence of the child in the home education program." 24 Pa. Stat. Ann. §13-1327.1(a). If the hearing examiner "finds that the documentation does not indicate that appropriate education is taking place in the home education program, the home education program for the child shall be out of compliance with the requirements of this section

15

and section 1327, and the student shall be promptly enrolled in the public school district of

residence or a nonpublic school or a licensed private academic school."  24 Pa. Stat. Ann. §13-

1327.1(k).  Either the supervisor of the program or the superintendent for the school district may

appeal the decision of the hearing examiner to the Secretary of Education (the executive branch)

or to the Commonwealth Court of Pennsylvania (the judicial branch). Id.

### D.   Pennsylvania Administrative Code and Protections of Religious Beliefs

The Pennsylvania Department of Education, headed by the Secretary of Education, is

charged by the General Assembly with developing rules and regulations to carry out its

legislative enactments as set forth in the Pennsylvania School Code.  Act of July 23, 1969, P.L.

181, § 1, 71 Pa. Stat. Ann. §§1037, 1038; Act of June 16, 1994, P.L. 319, No. 49, § 9, 64 Pa.

Stat. Ann. §468.   The Administrative Code provides the following regulations that are pertinent

to compulsory education and home education programs.

The PDE explains that public education "prepares students for adult life by

attending to their intellectual and developmental needs and challenging them to achieve at their

highest level possible. In conjunction with families and other community institutions, public

education prepares students to become self-directed, life-long learners and responsible, involved

citizens." 22 Pa. Code §4.11(b). Thus, public education is intended to provide opportunities for

students to:

> (1) Acquire knowledge and skills. (2) Develop integrity. (3) Process
> information. (4) Think critically. (5) Work independently. (6)
> Collaborate with others. [and] (7) Adapt to change.

22 Pa. Code §4.11(c).

Academic standards "describe the knowledge and skills which students will be expected

to demonstrate before graduating from a public school," and are set forth in section 4.12, 22 Pa. Code §4.12, while "assessment in public education" is designed to determine student attainment of state and local academic standards. 22 Pa. Code §4.11(d-e).  To that end, public schools "provide instruction throughout the curriculum so that students may develop knowledge and skills in the following areas:  (1) Reading, writing, speaking and listening; (2) Mathematics; (3) Science and technology; (4) Environment and ecology; (5) Social studies (civics and government, geography, economics and history); (6) Arts and humanities; (7) Career education and work; (8) Health, safety and physical education; (9) Family and consumer science; and (10) World languages. 22 Pa. Code §4.11(g)(1-10). Notably, religious instruction and training is omitted from the statutory and administrative objectives and curriculum.

The Code also defines "Planned instruction" as consisting of  "at least the following elements: (1) Objectives of a planned course, instructional unit or interdisciplinary studies to be achieved by all students; (2) Content, including materials and activities, and estimated instructional time to be devoted to achieving the academic standards. Courses, instructional units or interdisciplinary studies of varying lengths of time may be taught; (3) The relationship between the objectives of a planned course, instructional unit or interdisciplinary studies and academic standards specified under § 4.12 and to those determined in the school district's (including charter schools) or AVTS's strategic plan under § 4.13; and (4) Procedures for measurement of the objectives of a planned course, instructional unit or interdisciplinary studies."  22 Pa. Code §4.11(h).

"Students of compulsory school age participating in a home education program are subject to sections 1327(d) and 1327.1 of the Public School Code of 1949 [24 Pa. Stat. Ann.  §§

17

13-1327(d) and 1327.1]."  The Code provides that school district approval is <u>not required</u> to commence home education programs.  22 Pa. Code § 11.31(a).  For purposes of the Pennsylvania State Higher Education Grant Program, "an approved secondary school shall also include any home education program that is accredited by any home schooling accreditation agency approved by the Department of Education. If the home education program lacks the requisite accreditation, certification by the appropriate local school official attesting that the home education program is in compliance with Section 1327.1 of the Public School Code of 1949 [24 Pa. Stat. Ann. §13-1327.1] shall be submitted to the Agency by the appropriate local school official." 22 Pa. Code §121.21(c).

The Pennsylvania Administrative Code mandates that school districts adopt policies that preserve certain religious rights for parents and guardians of children of compulsory school age. First, children shall be "excused from specific instruction which conflicts with the religious beliefs of their parents upon receipt of a written request to the school district." 22 Pa. Code. §4.4(d)(3).  Second, if "upon inspection of State assessments parents or guardians find the assessments in conflict with their religious belief and wish their student be excused from the assessment, the right of the parents or guardians will not be denied upon written request to the applicable school district superintendent." 22 Pa. Code §4.4(d)(4).

The PDE also maintains a website [http://www.pde.state.pa.us/home_education] devoted to home education, which contains the text of Act 169, a list of frequently asked questions about home schooling and compliance with Act 169, sample forms and affidavits, acceptable tests, academic standards, and links to various resources available to assist home schooling parents, guardians and supervisors.

18

E.        **Pennsylvania Religious Freedom Protection Act**

In 2002, the Pennsylvania General Assembly enacted the Religious Freedom Protection

Act ("RFPA"), P.L. 1701, No. 214, Dec. 9, 2002, 71 Pa. Stat. Ann. §§2401-2407, described as

"An Act protecting the free exercise of religion; and prescribing the conditions under which

government may substantially burden a person's free exercise of religion." 71 Pa. Stat. Ann.

§2401. The RFPA was predicated on the following legislative findings:

> (1) Laws and governmental actions which are facially neutral toward
> religion, as well as laws and governmental actions intended to
> interfere with religious exercise, may have the effect of substantially
> burdening the free exercise of religion. However, neither State nor
> local government should substantially burden the free exercise of
> religion without compelling justification.
>
> (2) The General Assembly intends that all laws which it has
> heretofore enacted or will hereafter enact and all ordinances and
> regulations which have been or will be adopted by political
> subdivisions or executive agencies shall be construed so as to avoid
> the imposition of substantial burdens upon the free exercise of
> religion without compelling justification.

71 Pa. Stat. Ann. §2402.

The RFPA provides that an "agency shall not substantially burden a person's free exercise

of religion, including any burden which results from a rule of general applicability," unless the

"agency proves, by a preponderance of the evidence, that the burden is (1) In furtherance of a

compelling interest of the agency, and is (2) The least restrictive means of furthering the

compelling interest." 71 Pa. Stat. Ann. §2404.

The RFPA permits a person whose free exercise of religion has been burdened to assert

the violation against the agency as a claim or defense in any judicial proceeding. 71 Pa. Stat.

Ann. §2405(a).  Barring certain exigent circumstances not asserted herein, 71 Pa. Stat. Ann.

19

§2405(c), prior to raising such a claim or defense, the person must provide written notification, by certified mail, return receipt requested, informing the agency that:

> (1) The person's free exercise of religion has been or is about to be substantially burdened by an exercise of the agency's governmental authority.
> (2) A description of the act or refusal to act which has burdened or will burden the person's free exercise of religion.
> (3) The manner in which the exercise of the governmental authority burdens the person's free exercise of religion.

71 Pa. Stat. Ann. §2405(b)(1-3).

If a person asserting a claim or defense in accordance with the RFPA "proves, by clear and convincing evidence, that the person's free exercise of religion has been burdened or likely will be burdened," a court "may award the person such declaratory or injunctive relief as may be appropriate." 71 Pa. Stat. Ann. §2405(f). The awarding of monetary damages is strictly prohibited; attorney's fees may only be awarded when the actions of the agency were vexatious or dilatory. 71 Pa. Stat. Ann. §2405(f).

The RFPA applies "to any State or local law or ordinance and implementation of that law, whether statutory or otherwise and whether adopted or effective prior to or after the effective date of this act." 71 Pa. Stat. Ann. §2406(a). Furthermore, the application of the RFPA shall not "be construed to authorize any government to prohibit or penalize the holding of any religious belief or to take any action contrary to the Constitution of the United States or the Constitution of Pennsylvania." 71 Pa. Stat. Ann. §2407.

The General Assembly has provided definitions for some of the critical terms of the RFPA, as follows:

> "Free exercise of religion." The practice or observance of religion under section 3 of Article I of the Constitution of

20

Pennsylvania.

"Person." An individual or a church, association of churches or other religious order, body or institution which qualifies for exemption from taxation under section 501(c)(3) or (d) of the Internal Revenue Code of 1986 (Public Law 99-514, 26 U.S.C. § 501).

"Substantially burden." An agency action which does any of the following:
(1) Significantly constrains or inhibits conduct or expression mandated by a person's sincerely held religious beliefs.
(2) Significantly curtails a person's ability to express adherence to the person's religious faith.
(3) Denies a person a reasonable opportunity to engage in activities which are fundamental to the person's religion.
(4) Compels conduct or expression which violates a specific tenet of a person's religious faith.

71 Pa. Stat. Ann. §2403.

Article I, Section 3 of the Pennsylvania Constitution provides that "all men have a natural and indefeasible  right to worship Almighty God according to the dictates of their own conscience," that "no man can be compelled to attend, erect, or support any place of worship or to maintain any ministry against his own consent," and that no human authority can interfere with the "rights of conscience and no preference shall ever be given by law to any religious establishment or modes of worship."  Pa. Const., Art. I, §3.

**F**.      **Historical and Legislative Background of the Pennsylvania Religious Freedom Protection Act**

It is important to understand the historical and legislative background of the RFPA, to place it in proper context and to inform this Court's statutory interpretation of the RFPA and to properly resolve the statutory and constitutional challenges to Act 169, the home schooling statute.

Prior to 1990, legislation challenged under the Free Exercise Clause of the First

Amendment was subjected to a strict scrutiny analysis. See Sherbert v. Verner, 374 U.S. 398

(1963).  Under this test, laws which had the effect of substantially burdening the practice of a

person's religion were declared an unconstitutional infringement on the free exercise of religion

unless the state could show a compelling interest justifying the legislation, and that there were no

less restrictive ways to further that interest.  Id. at 402-404;  see also Hernandez v.

Commissioner, 490 U.S. 680 (1989) (rejecting free exercise challenge to payment of income

taxes alleged to make religious activities more difficult).

In 1990, the Free Exercise Clause landscape changed significantly with Employment Div.,

Dep't of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990).  In the Smith case, the

United States Supreme Court held that the Free Exercise Clause did not prohibit application of

Oregon's drug laws to the ceremonial ingestion of peyote, and thus, the state could, consistent

with that clause, deny claimants unemployment compensation for work-related misconduct based

on their use of the drug.  Speaking for the Court, Justice Antonin Scalia summarized the Free

Exercise jurisprudence as follows:

> The Free Exercise Clause of the First Amendment, which has been
> made applicable to the States by incorporation into the Fourteenth
> Amendment, see Cantwell v. Connecticut, 310 U.S. 296, 303 (1940),
> provides that "Congress shall make no law respecting an
> establishment of religion, or prohibiting the free exercise thereof . .
> . ." U.S. Const., Amdt. 1 (emphasis added.) The free exercise of
> religion means, first and foremost, the right to believe and profess
> whatever religious doctrine one desires. Thus, the First Amendment
> obviously excludes all "governmental regulation of religious beliefs as
> such." Sherbert v. Verner, supra, 374 U.S., at 402. The government
> may not compel affirmation of religious belief, . . . punish the
> expression of religious doctrines it believes to be false, . . . impose
> special disabilities on the basis of religious views or religious status, .

> . . or lend its power to one or the other side in controversies over
> religious authority or dogma . . . .

Id. at 876-77 (parallel and certain other citations omitted).

However, Justice Scalia noted that the Court had "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." Id. at 878-79.  The right of free exercise does not relieve an individual of the obligation to comply with a "valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." Id., at 898, relying, inter alia, on United States v. Lee, 455 U.S. 252, 263, n. 3 (1982) (Stevens, J., concurring in judgment) (religious belief of Amish taxpayer in conflict with payment of taxes affords no basis for resisting tax imposed on employers to support social security system, which must be applied uniformly to all except as Congress provides explicitly otherwise).

Accordingly, the United States Supreme Court held that, although a state would violate the Free Exercise Clause if it sought to ban the performance of (or abstention from) physical acts solely because of their religious motivation, Smith, 494 U.S. at 877-78, the Clause does not relieve an individual of the obligation to comply with a law that incidentally forbids (or requires) the performance of an act that his religious belief requires (or forbids) if the law is not specifically directed to religious practice, and is otherwise constitutional as applied to those who engage in the specified act for nonreligious reasons. Id. at 879-882.

The Court acknowledged two exceptions to the general rule that religiously neutral laws of general applicability do not violate the Free Exercise Clause.  First, as noted above, the Court recognized that a law which was neutral and general in its terms and applicability, but was

23

nevertheless deliberately enacted to impact some religious practice, would still be subjected to strict scrutiny. Id. at 877-78.  Second, the Court mentioned, in dictum, that the "only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action," were ones which "involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press . . . ." Id. at 881.   This exception has come to be known as the "hybrid rights" exception, of which the Court listed the following examples:

> Cantwell v. Connecticut, 310 U.S., at 304-307 . . . (invalidating a licensing system for religious and charitable solicitations under which the administrator had discretion to deny a license to any cause he deemed nonreligious); Murdock v. Pennsylvania, 319 U.S. 105 (1943) (invalidating a flat tax on solicitation as applied to the dissemination of religious ideas); Follett v. McCormick, 321 U.S. 573 (1944) (same), or the right of parents, acknowledged in Pierce v. Society of Sisters, 268 U.S. 510 (1925), to direct the education of their children, see Wisconsin v. Yoder, 406 U.S. 205 (1972) (invalidating compulsory school-attendance laws as applied to Amish parents who refused on religious grounds to send their children to school) . . . .

Id. at 881 (parallel citations omitted).

Finally, the Smith decision did not dilute the authority of the state to enact laws that protect its citizens' right to freely practice their religious beliefs.  The Court stated:

> Values that are protected against government interference through enshrinement in the Bill of Rights are not thereby banished from the political process. Just as a society that believes in the negative protection accorded to the press by the First Amendment is likely to enact laws that affirmatively foster the dissemination of the printed word, so also a society that believes in the negative protection accorded to religious belief can be expected to be solicitous of that value in its legislation as well. It is therefore not surprising that a number of States have made an exception to their drug laws for sacramental peyote use.

<u>Id</u>. at 890.

Following the <u>Smith</u> case, Congress and many state legislative assemblies accepted the Court's "invitation" to "enact laws that affirmatively foster" the free exercise of religion, as summarized recently by the United States Supreme Court in <u>Cutter v. Wilkinson</u> 125 S.Ct. 2113 (May 31, 2005).  Noting "there is room for play in the joints" between the Free Exercise and Establishment Clauses, 125 S.Ct. at 2121, <u>citing Smith</u>, 494 U.S. at 669, and that there is space for legislative action neither compelled by the Free Exercise Clause nor prohibited by the Establishment Clause, the Supreme Court held that the section of the Federal Religious Land Use and Institutionalized Persons Act ("RLUIPA") increasing the level of protection of prisoners' and other incarcerated persons' religious rights did not violate the Establishment Clause of the First Amendment. The Court summarized the post-<u>Smith</u> legislative reaction as follows:

> RLUIPA is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens, consistent with this Court's precedents.
>
> Responding to <u>Smith,</u> Congress enacted the Religious Freedom Restoration Act of 1993 (RFRA), . . . [which] "prohibits '[g]overnment' from 'substantially burden[ing]' a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate the burden '(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" <u>City of Boerne v. Flores</u>, 521 U.S. 507, 515-516 (1997) (brackets in original) (quoting § 2000bb-1). "[U]niversal" in its coverage, RFRA "applie[d] to all Federal and State law," <u>id</u>., at 516, 117 S.Ct. 2157 (quoting former § 2000bb-3(a)), but notably lacked a Commerce Clause underpinning or a Spending Clause limitation to recipients of federal funds. In <u>City of Boerne</u>, this Court invalidated RFRA <u>as applied to States</u> and their subdivisions, holding that the Act exceeded Congress' remedial powers under the Fourteenth Amendment. <u>Id</u>., at 532-536. FN2

---------

FN2. RFRA, Courts of Appeals have held, remains operative
as to the Federal Government and federal territories and possessions. .
. . This Court, however, has not had occasion to rule on the matter.

--------

Congress again responded, this time by enacting RLUIPA.
Less sweeping than RFRA, and invoking federal authority under the
Spending and Commerce Clauses, RLUIPA targets two areas: Section
2 of the Act concerns land-use regulation, 42 U.S.C. § 2000cc; § 3
relates to religious exercise by institutionalized persons, § 2000cc-1.
Section 3, at issue here, provides that "[n]o [state or local]
government shall impose a substantial burden on the religious
exercise of a person residing in or confined to an institution," unless
the government shows that the burden furthers "a compelling
governmental interest" and does so by "the least restrictive means." §
2000cc-1(a)(1)-(2). The Act defines "religious exercise" to include
"any exercise of religion, whether or not compelled by, or central to, a
system of religious belief." § 2000cc-5(7)(A). Section 3 applies when
"the substantial burden [on religious exercise] is imposed in a
program or activity that receives Federal financial assistance," or "the
substantial burden affects, or removal of that substantial burden
would affect, commerce with foreign nations, among the several States, or
with Indian tribes." § 2000cc-1(b)(1)-(2). "A person may assert a
violation of [RLUIPA] as a claim or defense in a judicial proceeding
and obtain appropriate relief against a government." § 2000cc-2(a).

125 S.Ct. at 2118-2119 (parallel and other citations and certain footnotes omitted).

Numerous states passed their own religious freedom restoration or protection legislation

in response to the Smith and City of Boerne cases, to restore the traditional (compelling interest,

strict scrutiny) test.   See generally Porto, Brian L., J.D., Validity, Construction and Operation of

State Religious Freedom Restoration Acts, 116 A.L.R. 5th 233 (2005); Menninger, Karl A., J.D.,

Interference With the Right to Free Exercise of Religion, 63 Am. Jur. Proof of Facts 3d 195

(2005).  Pennsylvania is one such state, as remarks by the RFPA's co-sponsor, President pro

tempore Senator Robert C. Jubelirer and many other Senators demonstrate. 186th Gen. Assem.,

Pa. Senate Journal, 2002 Reg. Sess. No. 67, Bill on Third Consideration and Final Passage

26

(November 20, 2002).

### III.  The Litigation

After completion of discovery and submission of Defendants' statements of material facts

and plaintiffs' response thereto, the Court finds there are no disputed *material* facts that need to

be resolved by a finder of fact.  The facts of the litigation set forth below are gathered primarily

from the parties' initial pleadings (i.e., complaints and answers), as supplemented by the

statements of material facts and responses thereto.

### A.    <u>Combs v. Homer-Center School District, Civil Action No. 04-1599</u>

Plaintiffs Darrell and Kathleen Combs filed suit against Homer-Center School District

and Joseph F. Marcoline, in his official capacity as Superintendent of the School District, in the

Court of Common Pleas of Indiana County, Pennsylvania, on September 23, 2004, seeking both

declaratory and injunctive relief pursuant to the RFPA, the First and Fourteenth Amendments to

the United States Constitution, and 42 U.S.C. §1983. (Complaint, Intro.).  Defendants removed

the case to United States District Court for the Western District of Pennsylvania, pursuant to 28

U.S.C. §1441, on October 19, 2004.  The pertinent factual averments from the complaint are as

follows.

The Combs are the parents of children who are of compulsory school age within the

statutory language of the Pennsylvania School Code, 24 P.S. §1326, and reside within the

boundaries of the Homer-Center School District. (Complaint, ¶¶1, 2).  Pursuant to Act 169,

Plaintiffs elected to home school their children based on sincerely held religious beliefs for the

past eight years.  (Complaint, ¶5). Defendants are charged with administering the Home

Education Program and the enforcement of Pennsylvania's compulsory school attendance laws.

(Complaint, ¶4). In accordance with Act 169, Plaintiffs submitted an affidavit stating their proposed educational objectives for the 2003-2004 school year on or about June 5, 2003. (Complaint, ¶6). In a letter dated July 28, 2003, Plaintiffs notified Defendants that Act 169 imposed substantial burdens on the free exercise of their religion. (Complaint, ¶¶7, 10). Furthermore, in reliance upon the RFPA, Plaintiffs sought "the protection of the [RFPA]" (Complaint, ¶8).

Plaintiffs concede that their "religious beliefs acknowledge that the civil government may require them to educate their children, but according to their religious belief, the civil government lacks jurisdiction to approve or administratively supervise the education they provide." (Complaint, ¶12). Plaintiffs express the sincerely held religious belief that "God has given parents jurisdiction and authority over the education of their children," that it would be "sinful for them to engage in conduct or expression that would grant control over their children's education to the civil government . . . [or require them to] seek approval from the secular civil government for the holy and sacred education that they are duty bound by God to provide their children," and that "parents are charged by God to raise their children in the nurture and admonition of the Lord." (Complaint, ¶¶13-16).

More specifically, Plaintiffs complain that: (1) Act 169 cedes too much control over their children's religious education to Defendants, and requires them to become "excessively associated" with the School District, in requiring them to submit an affidavit outlining their educational objectives to Defendants at the beginning of each school year; (2) their free exercise of religion is substantially burdened because Act 169 requires that they submit an educational log and a portfolio containing samples of their children's work to Defendants for discretionary

28

administrative review; and (3) Act 169 confers the district superintendent with unbridled

"authority, jurisdiction, and subjective discretion to approve the appropriateness of the religious

education they provide their children based upon his review of the educational log and portfolio."

(Complaint, ¶¶22, 23, 24).

Defendant Marcoline warned Plaintiffs that if they chose to pursue an exemption from

Act 169 based on their religious beliefs, he would be compelled to enforce Pennsylvania's

compulsory school attendance laws, and subsequently, Marcoline requested Plaintiffs submit

their formal evaluation, educational log, and portfolio containing samples of their children's

educational work for administrative review. (Complaint, ¶28-29).  Plaintiffs responded that they

did not intend to submit the requested materials because they were claiming a religious

exemption under the Pennsylvania Religious Freedom Protection Act. (Complaint, ¶30).  Based

upon Plaintiffs' failure to comply, Defendant Marcoline initiated a prosecution against Plaintiffs

for truancy. (Complaint, ¶¶40, 41, 42).

Plaintiffs also aver that Superintendent Marcoline did not notify them of his initial

determination that "appropriate education" was not taking place, and did not initiate the "appeal"

and hearing procedures required by the home schooling act for making a final determination

about the "appropriate education."  (Complaint, ¶¶31-36).

Plaintiffs' complaint sets forth seven counts. Count I claims that Act 169 violates the

RFPA. (Complaint, ¶¶22, 23, 49, 52). Count II asserts violation of the Due Process Clause of the

Fourteenth Amendment to the United States Constitution because Act 169's educational log and

portfolio requirements "vest Defendants with unbridled discretionary review" of Plaintiffs'

religious home education to determine whether appropriate education is occurring. (Complaint,

¶59). Count III alleges that Act 169 violates the Due Process Clause because the statute fails to provide a "neutral magistrate," one who has no vested financial stake in the outcome of the decision.  (Complaint, ¶¶61, 62).  The amount of state funding a district receives is determined, in part, by how many students attend the district; therefore, Plaintiffs allege, the district superintendent has an impermissible financial stake in determining whether appropriate home education is occurring.  (Complaint, ¶¶64, 65).

Count IV alleges a Due Process violation because Act 169 invades Plaintiffs' right to privacy in requiring parents to maintain and submit to the district superintendent a detailed log of the titles of books read by their children and samples of their children's educational work. (Complaint, ¶¶68, 69).  Count V asserts a "prior restraints," First Amendment Free Speech violation, arguing that the "government cannot demand the right to review prior speech as a condition to exercising the right to engage in future speech." (Complaint, ¶71).  Before parents can commence a home education program, Act 169 requires that they submit an affidavit prior to the start of each school year outlining their educational objectives.  (Complaint, ¶73).  After the first year of home schooling, Act 169 requires parents to obtain the discretionary approval of the district superintendent "in order to engage in further, future acts of protected speech for the following year."  (Complaint, ¶¶72, 74).

Count VI alleges that Act 169 violates the First Amendment Establishment Clause by creating excessive entanglement with citizens' free exercise of religion. (Complaint, ¶77). Specifically, Plaintiffs assert that the Establishment Clause prohibits state agencies from conducting discretionary reviews of the content of religious education, or from having the power to "authorize or approve religious education." (Complaint, ¶78).  Plaintiffs argue that Act 169's

requirement that they submit an educational log and a portfolio to the Superintendent at the end of each school year for his discretionary review is itself a form of excessive entanglement because Defendants have the authority to determine whether appropriate religious home education is occurring. (Complaint, ¶79).

Finally, Count VII asserts that Act 169 violates the Free Exercise Clause. "Generally applicable, neutral statutes that impose substantial burdens on religiously motivated conduct that is reinforced with the rights of parents to direct their children's religious home education violates the Free Exercise Clause unless supported by a compelling state interest and the least restrictive means is employed to realize that state interest." (Complaint, ¶81). Plaintiffs assert that Act 169 imposes substantial burdens on their free exercise of religion because the statute compels them to engage in conduct and expression that violate specific tenets of their religious faith. (Complaint, ¶ 82). Also, Plaintiffs allege that there is no compelling state interest in burdening Plaintiffs' free exercise of religion, and if there is, the least restrictive means were not employed to realize that interest. (Complaint, ¶ 81).

Plaintiffs seek a preliminary and permanent injunction, enjoining Defendants from prosecuting Plaintiffs under the compulsory education laws for truancy because of their refusal to submit the logs and portfolios required by Act 169. Plaintiffs also request this Court to render the following declaratory relief: (i) to declare that Act 169 compels conduct and expression that violates specific tenants of Plaintiffs' religious faith, and therefore violates the RFPA ; (ii) to declare Act 169's log and portfolio requirements "void for vagueness" under the Due Process Clause, on its face and as applied to Plaintiffs' "religious education program"; (iii) to declare Act 169's "requirement for a superintendent's review of the contemporaneous log and portfolio"

31

unconstitutional on its face and as applied, because the superintendent is not a "neutral magistrate"; (iv) to declare Act 169's "requirement for a superintendent's review of the contemporaneous log and portfolio" unconstitutional on its face and as applied, because it violates Plaintiffs' Due Process right to privacy; (v) to declare Act 169's requirement that parents submit an outline of proposed course objectives by subject area unconstitutional on its face and as applied because it amounts to "prior restraint" of speech, prohibited by the Free Speech Clause of the First Amendment; (vi)  to declare Act 169's "requirement for a superintendent's review of the contemporaneous log and portfolio" unconstitutional as applied, because it results in "excessive entanglement with religion" in violation of the Establishment Clause of the First Amendment; and (vii) to declare Act 169's "requirement for a superintendent's review of the contemporaneous log and portfolio" unconstitutional on its face and as applied under the Free Exercise Clause of the First amendment.

Defendants have not averred any significant factual denials in their answer; rather, Defendants aver the following affirmative defenses: (1) Plaintiffs' complaint fails to state a claim for which relief can be granted; (2) Act 169 does not substantially burden Plaintiffs' free exercise of their religion since the Act is a generally applicable, neutral statute that is not hostile towards religion; (3) the RFPA is itself unconstitutional[14] because it unlawfully creates substantive rights and violates traditional separation of powers between the legislature and the judiciary; (4) Plaintiffs' claims are barred by any applicable statute of limitations and/or laches; (5) Plaintiffs'

---

[14] It is unusual, if not improper, for a state agency charged with enforcing the laws of Pennsylvania to challenge legislation as unconstitutional, especially in the absence of participation by the Attorney General for the Commonwealth of Pennsylvania.  Defendants have not advanced this argument in their motion for summary judgment or in response to Plaintiffs' motion for summary judgment.

claims are barred by the doctrine of privilege; (6) Plaintiffs' claims are barred by the doctrine of

justification; (7) Plaintiffs consented to the requirements of the home education program of Act

169 by electing to home school their children; (8) Defendants are entitled to any immunity as

provided by state and/or federal law; (9) Act 169 neither burdens Plaintiffs' free exercise of their

faith nor causes excessive entanglement; (10) Plaintiffs' right to privacy has not been violated

because the government has a legitimate and compelling interest in ensuring the education of

children, and Act 169 is not unwarranted government intrusion into the rearing and education of

Plaintiffs' child; (11) Act 169 does not impose any restraint on Plaintiffs' exercise of free speech;

and (12) Plaintiffs' free exercise of religion has not been violated since the government has a

legitimate and compelling interest in ensuring the education of children, and Act 169 is not

unwarranted government intrusion into the education of Plaintiffs' children. (Answer, ¶¶13, 14).

### B.     Prevish v. Norwin School District- Civil Action No. 04-1670

Plaintiffs Thomas and Timari Prevish filed suit against Norwin School District and

Richard Watson, in his official capacity as Superintendent, in the Court of Common Pleas of

Westmoreland County, Pennsylvania on September 27, 2004, seeking both declaratory and

injunctive relief pursuant to the RFPA, the First and Fourteenth Amendments to the United

States Constitution, and 42 U.S.C. §1983. (Complaint, Intro.).  This Court obtained jurisdiction

pursuant to Defendants' motion for removal pursuant to 28 U.S.C. §1441. The factual averments

and legal claims set forth in the Prevish complaint are quite similar to those in the Combs'

complaint.

The Previshes are the parents of children who are of compulsory school age and reside

within the boundaries of the Norwin School District. (Complaint, ¶¶1, 2).  Pursuant to Act 169,

Plaintiffs elected to home school their son, Thomas Prevish, based on sincerely held religious beliefs for the past seven years.  (Complaint, ¶9). Defendants are charged with administering the home education program and the enforcement of Pennsylvania's compulsory school attendance laws. (Complaint, ¶4).  In accordance with the RFPA, Plaintiffs notified Defendants on August 1, 2004, that Act 169 substantially burdens their free exercise of religion and sought an exemption. (Complaint, ¶¶13, 14, 16).  Plaintiffs believe: (1) Defendants "lack jurisdiction to approve or administratively supervise the education" they provide Thomas Prevish, (Complaint, ¶18), and that it would be sinful to: (1) "engage in conduct and expression that would seek approval from the secular civil government" for the religious home education they are duty-bound by God to provide their children. (Complaint, ¶23).  Specifically, Plaintiffs object to filing an affidavit outlining their educational objectives prior to the start of each school year. (Complaint, ¶29). Furthermore, Plaintiffs object to submitting an educational log and a portfolio containing samples of Thomas Prevish's educational work. (Complaint, ¶30).  In a letter dated September 7, 2004, Timothy McCabe, agent for Defendants, informed Plaintiffs that Thomas Prevish was absent from school without lawful excuse. (Complaint, ¶32).  The letter further stated that if Thomas is subsequently absent from school, Plaintiffs will be charged with truancy. (Complaint, ¶34).  Thus, unless exempted from complying with Act 169, Plaintiffs will be subjected to criminal prosecution for truancy. (Complaint, ¶33).

The seven claims averred are virtually identical to those set forth in the complaint in *Combs.* (Complaint, ¶¶ 38-75).  Defendants aver only one significant denial:  Defendants deny that Act 169 is vague; rather, Defendants aver that the hearing officer created by Act 169 is a neutral and detached adjudicator with little or no financial interest, because the number of

34

students attending Norwin School District is only one factor in determining how much state funding Norwin receives. (Answer, ¶57).  Furthermore, Defendants aver affirmative defenses identical to those in *Combs* (Answer, ¶¶1-14), and raise the following additional affirmative defenses: (1) Plaintiffs have failed to mitigate any alleged harm (Answer, ¶7); (2) it is not a "sincerely held religious belief" that to cede authority and/or discretion to Defendants in order to educate Thomas Prevish is a sin, because it is not a tenet of the "Church's Magisterium," sacred Scripture, nor sacred tradition as alleged by Plaintiffs (Answer, ¶10); (3) Plaintiffs waived their right to challenge Act 169 by settling with Defendant in agreeing to comply with the terms of the home education program of Act 169 on November 6, 2003. (Answer, ¶4).

### C.   Hankin v. Bristol Township School District - Civil Action No. 04-1936

Plaintiffs Thomas and Babette Hankin filed suit against Bristol Township School District and Regina Cesario, in her official capacity as Superintendent, in the United States District Court for the Western District of Pennsylvania on December 22, 2004, seeking both declaratory and injunctive relief pursuant to the RFPA, the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. §1983. (Complaint, Intro.).[15]  This Court obtained jurisdiction pursuant to 28 U.S.C. §1343(3)(4) and §1331. (Complaint, ¶2).  The RFPA state law claim is predicated on this court's supplemental jurisdiction.  28 U.S.C. § 1367.  The pertinent factual averments of the pleadings are as follows.

The Hankins are the parents of children who are of compulsory school age and reside

_____

[15] Ordinarily, this case would have been filed in the United States District Court for the Eastern District of Pennsylvania, but aware of the several similar cases in the Western District of Pennsylvania, the parties agreed that Plaintiffs would file the case in this district and Defendants would not object to venue, in the interests of conservation of judicial and legal resources.

within the boundaries of Bristol Township School District. (Complaint, ¶ 4, 5).  Pursuant to Act 169, Plaintiffs elected to home school their children based on sincerely held religious beliefs for the past eleven years.  (Complaint, ¶ 8). Plaintiffs notified Defendants on April 2, 2004, that Act 169 substantially burdens their free exercise of religion.  (Complaint, ¶ 10).  Specifically, Plaintiffs object to: (1) filing an affidavit outlining their educational objectives prior to the start of each school year, and (2) submitting an educational log and a portfolio containing samples of their children's educational work.  (Complaint, ¶¶ 25, 26 ).  Hence, Plaintiffs claimed an exemption under the RFPA in their letter dated March 6, 2004. (Complaint, ¶ 11).  Defendants' agents informed Plaintiffs that their children were illegally absent from school, and warned that if the children were not enrolled in public school, private school, or a registered home schooling program within three days, Defendants would charge Plaintiffs with truancy. (Complaint, ¶¶ 28, 29).  Thus, unless exempted from Act 169, Plaintiffs will be subject to criminal proceedings for truancy. (Complaint, ¶ 30).

The claims averred are identical to those in *Combs and Prevish.* (Complaint, ¶¶ 38-75). Similarly, Defendants aver affirmative defenses identical to those in *Combs*, although Defendants aver one additional affirmative defense. (Answer, ¶¶ 69-81).  Defendants assert that Plaintiffs' claims are barred because they failed to exhaust administrative remedies. (Answer, ¶ 80). Pursuant to local agency law, prior to bringing a matter before a court vested with jurisdiction there must be a final adjudication by the local agency. In this instance, Plaintiffs failed to request a hearing before the Board of School Director for Bristol Township School District regarding the allegations in their complaint.

D.    **Newborn v. Franklin Regional School District - Civil Action No. 04-1932**

36

Plaintiffs Mark and Maryalice Newborn filed suit against Franklin Regional School District and Stephen Vak, in his official capacity as Superintendent, in the United States District Court for the Western District of Pennsylvania on December 21, 2004, seeking both declaratory and injunctive relief pursuant to the RFPA, the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. §1983. (Complaint, Intro.).  This Court obtained jurisdiction pursuant to 28 U.S.C. §1343(3)(4) and 28 U.S.C. §1331.  (Complaint, ¶2).  The pertinent factual averments of the pleadings are as follows.

The Newborns are the parents of children who are of compulsory school age and reside within the boundaries of Franklin Regional School District. (Complaint, ¶¶5, 6).  Pursuant to Act 169, Plaintiffs elected to home school their children based on sincerely held religious beliefs for the past twelve years.  (Complaint, ¶9). In accordance with the RFPA, Plaintiffs notified Defendants on August 1, 2003, that Act 169 substantially burdens their free exercise of religion and sought an exemption. (Complaint, ¶¶10, 11, 13).  Plaintiffs believe that: (1) Defendants "lack jurisdiction to approve or administratively supervise the education" they provide their children, and (2) that it would be sinful to "engage in conduct and expression that would seek approval from the secular civil government" for the religious home education they are duty-bound by God to provide their children. (Complaint, ¶¶15, 18).  Specifically, Plaintiffs object to filing an affidavit outlining their educational objectives prior to the start of each school year. (Complaint, ¶26).  Furthermore, Plaintiffs object to submitting an educational log and a portfolio containing samples of their children's educational work. (Complaint, ¶ 27).  In a letter dated November 21, 2003, Defendants informed Plaintiffs that they did not believe that the home education program imposed substantial burdens on the free exercise of Plaintiffs' religion. (Complaint, ¶ 29).

Additionally, the letter stated that Defendants were considering initiating truancy proceedings because Plaintiffs failed to provide an affidavit outlining their educational objectives for the 2003-2004 school year. (Complaint, ¶31).  Thus, unless exempted from complying with Act 169, Plaintiffs will be subjected to criminal prosecution for truancy. (Complaint, ¶ 33).

The claims averred are identical to those in the other complaints.  (Complaint, ¶¶ 35-69). Similarly, Defendants aver affirmative defenses identical to those in *Combs,* and deny that their letter dated November 21, 2003, intimated that they were considering initiating truancy proceedings. (Answer, ¶¶ 31, 71-89).

### E.     Nelson v. Titusville Area School District - Civil Action No. 05-070E

Plaintiffs Douglas and Shari Nelson filed suit against Titusville Area School District and John D. Reagle, in his official capacity as acting Superintendent, in United States District Court for the Western District of Pennsylvania on February 28, 2005, seeking both declaratory and injunctive relief pursuant to the RFPA, the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. §1983. (Complaint, Intro.).  This Court obtained jurisdiction pursuant to 28 U.S.C. §1343(3)(4) and 28 U.S.C. §1331.  (Complaint, ¶2).  The pertinent factual averments of the pleadings are as follows.

The Nelsons are parents of children who are of compulsory school age and reside within the boundaries of Titusville Area School District. (Complaint, ¶¶4, 5).  Pursuant to Act 169, Plaintiffs elected to home school their children based on sincerely held religious beliefs for the past eight years.  (Complaint, ¶8).  In accordance with the RFPA, Plaintiffs notified Defendants that Act 169 substantially burdens their free exercise of religion and sought an exemption from Act 169. (Complaint, ¶¶9, 10).  Plaintiffs believe: (1) Defendants "lack jurisdiction to approve or

38

administratively supervise the education" they provide their children, and that (2) it would be sinful to "engage in conduct and expression that would seek approval from the secular civil government" for the religious home education they are duty-bound by God to provide their children. (Complaint, ¶¶14, 18). Specifically, Plaintiffs object to filing an affidavit outlining their educational objectives prior to the start of each school year. (Complaint, ¶24). Furthermore, Plaintiffs object to submitting an educational log and a portfolio containing samples of their children's educational work. (Complaint, ¶25).

In letters dated August 11, 2004, and September 24, 2004, Defendants requested Plaintiffs submit their educational log and portfolio. (Complaint, ¶27). Subsequently, in a letter dated January 10, 2005, Defendants informed Plaintiffs that if they "did not submit portfolios for the 2003-2004 school year, and an affidavit of intent to home educate for the 2004-2005 school year," then Defendants would initiate truancy proceedings. (Complaint, ¶28). Thus, unless exempted from Act 169, Plaintiffs will be subjected to criminal prosecution for truancy. (Complaint, ¶30).

The claims averred are identical to those in *Combs* as are the affirmative defenses. (Complaint, ¶¶37-71; Answer ¶¶64-82).

F.     **Weber v. Dubois Area School District - Civil Action No. 05-203J**

Plaintiffs Steven and Meg Weber filed suit against Dubois Area School District and Sharon Kirk, in her official capacity as Superintendent, in the United States District Court for the Western District of Pennsylvania on March 23, 2005, seeking both declaratory and injunctive relief pursuant to the RFPA, the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. §1983. (Complaint, Intro.). This Court obtained jurisdiction

39

pursuant to 28 U.S.C. §1343(3)(4) and 28 U.S.C. §1331.  (Complaint, ¶ 2).  The pertinent factual averments of the pleadings are as follows.

The Nelsons are parents of children who are of compulsory school age and reside within the boundaries of Dubois Area School District. (Complaint, ¶¶4, 5).  Pursuant to Act 169, Plaintiffs elected to home school their children based on sincerely held religious beliefs for the past eight years.  (Complaint, ¶8). Defendants are charged with administering the Home Education Program and the enforcement of Pennsylvania's compulsory school attendance laws. (Complaint, ¶7).  In accordance with the RFPA, Plaintiffs notified Defendants on July 10, 2004, that Act 169 substantially burdens their free exercise of religion and sought an exemption. (Complaint, ¶¶10, 12).  Plaintiffs believe: (1) Defendants "lack jurisdiction to approve or administratively supervise the education," they provide their children, and (2) that it would be sinful to "engage in conduct and expression that would seek approval from the secular civil government" for the religious home education they are duty-bound by God to provide their children. (Complaint, ¶¶13, 17).  Specifically, Plaintiffs object to filing an affidavit outlining their educational objectives prior to the start of each school year. (Complaint, ¶24).  Furthermore, Plaintiffs object to submitting an educational log and a portfolio containing samples of their children's educational work to Defendants for discretionary review. (Complaint, ¶25).

In a letter dated December 3, 2004, Defendants' agent informed Plaintiffs that they did not believe the Home Education Program imposed substantial burdens on the free exercise of Plaintiffs' religion. (Complaint, ¶27). Subsequently, on January 11, 2004, Defendants informed Plaintiffs that they would initiate truancy proceedings unless Plaintiffs' children attended public school. (Complaint, ¶28). In response, Dewitt T. Black III, attorney for Home School Legal

40

Defense Association, wrote to Defendants on behalf of the Plaintiffs on January 13, 2005, and on February 23, 2005, requesting that they wait to file truancy charges until five federal cases on the applicability of the RFPA to Act 169 were resolved." (Complaint, ¶29). Defendants replied on February 28, 2005, stating that they decided not to wait until the five outstanding federal cases were resolved prior to filing truancy charges. (Complaint, ¶30). Thus, unless exempted from complying with Act 169, Plaintiffs will be subjected to criminal prosecution for truancy. (Complaint, ¶31).

The claims averred are identical to those in *Combs* as are the affirmative defenses. (Complaint, ¶¶35-69, Answer, ¶¶1-14). In terms of denials, Defendants deny that Sharon Kirk, in her official capacity as Superintendent of Dubois Area School District, is subject to liability for the aforementioned claims. (Answer, ¶6). Also, Defendants averred that the parties have entered into a stipulation regarding the prosecution of truancy charged against Plaintiffs. (Answer, ¶30).

## IV.  Summary Judgment Framework and Standards

### A.      History of Plaintiffs' "Facial" Challenges

Because Plaintiffs are challenging Act 169 both "on its face" and "as applied," the Court decided, with input and consent of the parties, that two rounds of summary judgment motions would be the appropriate way to proceed, with the first round to address the "on its face" constitutional challenges, and the second round to address the "as applied" challenges. By Order of March 15, 2005, the Court consolidated all of the cases at Civil Action No. 04-1599, and directed a "consolidated summary judgment motion addressed to the threshold legal issues discussed at the conference" to be filed.

The initial motion for summary judgment by Plaintiffs (previously decided by the Court in Defendants' favor) was not expected to raise any "fact-driven" issues, since discovery was on-going and briefing on such issues would be premature.  Defendants were directed to file one consolidated response and brief in opposition, and Plaintiffs were permitted to file a reply brief. Subsequently, the Court granted the motion of the Commonwealth of Pennsylvania Department of Education to file an *amicus* brief in opposition to the motion for summary judgment, which "emphasize[d] the Commonwealth's compelling interest in ensuring high-quality home education without imposing an undue burden on the religious interests of parents."  Amicus Brief at 1.  Later, the Court directed the PDE to file a supplemental brief addressing the interplay between the School Code and the RFPA.  An additional status conference was conducted on April 11, 2005, for the purpose of clarifying the scope of the threshold summary judgment motion.

On May 31, 2005, Plaintiffs filed their consolidated motion for summary judgment, brief in support, concise statement of material facts, and 30 volumes of appendices. (Documents No. 29-61, respectively). The appendices consisted of the portfolios, logs, declarations and other documentation put together by the Plaintiffs in the six consolidated cases, and those put together by 24 other non-party parents and supervisors of home education programs in various party and non-party school districts.  Because the 30 volumes of materials were not relevant to the threshold issues, the Court granted Defendants' joint motion to strike the appendices in part, stating that "Plaintiffs . . . filed boxes of appendices (doc. nos. 32 through 61) consisting of 30 notebooks of factual information and declarations.  The Court will not consider said material at this time but instead will stay focused on the threshold legal issues."  Order of June 16, 2005

(Document No. 67).

In their concise statement of material facts ("CSM"), Plaintiffs make the following assertions.  All of the Plaintiffs' home schooled children have been home schooled "between five and thirteen years." CSM ¶ 2.  All of the Plaintiff-Parents believe that children are a gift from God, that "education is religion," that "God commands them to educate their children at home," that Plaintiffs "believe that the requirements of Act 169 puts the State as the final authority over the education of their children, which is a violation of their religious belief," and that Act 169 "requires conduct or expression that violates their religious beliefs" making it impossible to comply with Act 169 "in good conscience." CSM, ¶¶ 6-11.

Plaintiffs assert that many of their portfolios include "religious work samples."  CSM, ¶15.  The concise statement of material facts then sets forth the following: descriptions of the portfolio/ documentation/ declaration appendices submitted by Plaintiffs and 24 non-parties, ¶¶16-42; descriptions of the "Effects of Portfolios," including that portfolios take time to assemble, provide no educational benefit, induce stress ("pre-portfolio syndrome"), that some of the portfolios were returned apparently without having been reviewed, and that "some home schooling parents feel it is an invasion of their privacy to meet with a school district supervisor to review their portfolios."  CSM ¶¶ 43-52.  The concise statement also complains that the various party and non-party school districts utilized a variety of approaches in reviewing the portfolios and logs, and applied varying degrees of intensity of review. CSM ¶¶ 53-79.

Finally, Plaintiffs make the following conclusory statements: the "detailed requirements of Act 169 as interpreted by the PDE are not in furtherance of a compelling state interest"; the "detailed requirements of Act 169 as interpreted by the PDE are not the least restrictive means"

43

of furthering a compelling state interest; 27 states do not require year-end assessments; 21 states require either standardized tests or evaluation, but not both; only eight other states require portfolios; no other state requires a detailed log. CSM ¶¶ 80-85.

### B.     The "Substantial Burden" Identified by Plaintiffs

Plaintiffs acknowledge that RFPA obligates them to first show that Act 169 imposes a "substantial burden" on the exercise of their religion, by clear and convincing evidence, in order to shift the burden of proof to the school districts and superintendents to justify that burden by demonstrating the state's compelling interest and that there are no less restrictive means of furthering that interest.  Brief in Support of Plaintiffs' Motion for Summary Judgment at 5.  The specific statutory burden Plaintiffs assert is the fourth identified by the RFPA, namely, where the agency action "[c]ompels conduct or expression which violates a specific tenet of a person's religious faith."  71 Pa. Stat. Ann. §2402(4).  Brief in Support of Plaintiffs' Motion for Summary Judgment at 5.

Despite having home schooled their children from at least five to thirteen years, however, Plaintiffs do not specify any actual, tangible ways in which Act 169 impairs or restricts the exercise, practice, conduct or expression of their religion during those five to thirteen years or currently.  The "Effects of Portfolios" that Plaintiffs identify as flowing from Act 169's portfolio and log requirements (i.e., these requirements are time consuming and stressful, and not beneficial to their children's education) are the same effects encountered by all parents and supervisors of home schooled children, not just those who home school for religious reasons.  In other words, these "Effects" do not describe any particular impact on the exercise, practice, conduct or expression of religion, but rather describe the common, general consequences caused

44

by Act 169's requirements that home schoolers compile, organize and present portfolios and logs for review by school districts and their superintendents.

Although Plaintiffs state that their "focus" in this litigation is on Act 169's portfolio requirements, the only negative effect alleged that is <u>not</u> common to all home schoolers, and the only religious impact that a fair reading of Plaintiffs' concise statement of material facts and brief will sustain, is that Act 169 places "authority" over their children's education, which, to Plaintiffs, "is religion," in secular hands, and that placing of authority in any state agency violates their sincerely held religious beliefs.  Brief in Support of Plaintiffs' Motion for Summary Judgment at 5-7.  Plaintiffs state that "the Lord has established jurisdictional boundaries between the family and the State," that "subjecting their home education program to the authority, oversight and discretionary review of the State violates Biblically-ordained jurisdictional lines between the family and the State," and that these "twelve Plaintiffs, who come from diverse religious backgrounds, have each concluded that compliance with Act 169 amounts to an unbiblical surrendering of their God given authority as parents to the State." Brief in Support of Plaintiffs' Motion for Summary Judgment at 6-7.

### C.  Defendants' Motion for Summary Judgment - "As Applied" Challenges

After this Court's ruling on Plaintiffs' motion for summary judgment and completion of fact discovery, the school districts filed their consolidated motion for summary judgment (Document No. 100) asserting that "there is no genuine issue of material fact, nor could any fact finder reasonably conclude that the school districts have substantially burdened the practice of the Plaintiffs' faith in enforcing Act 169 or, 'as applied.'" Defendants' Motion for Summary Judgment, ¶ 4.  In their consolidated concise statement of material facts, Defendants aver the

following facts that are relevant to their implementation of Act 169.

1.       **Prevish v. Norwin School District - Civil Action No. 04-1670**

The Previshes are Roman Catholics who use a religious based curriculum in home schooling their 12 year old son, the "Sonlight Curriculum."  The school district has never interfered with their choice (or any parents' choice) of educational materials or in the education of their children, has never interfered in the Previshes' participation of the sacraments of their Roman Catholic faith, never rejected or denied any aspect of the Previshes' portfolios including religious based curriculum, and encourages parents to include any religious instruction in their portfolios.  The Previshes did not object to compliance with Act 169 until August 26, 2004, when they informed the Superintendent that they did not intend to continue to comply with its requirements. The school district has agreed to stay any truancy prosecution pending the outcome of this litigation.

2.       **Weber v. Dubois Area School District - Civil Action No. 05-2035**

The Webers belong to the Tri-County Church of God, and are parents of two compulsory school aged children.  The Webers concede that the school district never interfered with the God-centered education of their children, or their participation in any sacraments of their faith.  The school district never rejected any home schooling plan because of its inclusion of religious instruction.  The Webers object to the time and energy spent in compiling the portfolios and logs, and to the exercise of any authority by the state over the education of their children, based on their religious beliefs that God has delegated that authority to parents alone.  On July 10, 2004, the Webers notified the school district that Act 169 had substantially burdened their religious beliefs, and sought an exemption from compliance, which was denied.  The school district agreed

46

to stay any truancy prosecution pending the outcome of this litigation.

###    3.        Newborn v. Franklin Regional School District - Civil Action No. 04-1932

This school district reviews certifications by third party evaluators that "appropriate education" has taken place. The parents choose their own evaluators and the Newborns have chosen a like-minded Christian evaluator to review their portfolios and logs and prepare the certificate.  The school district has never disagreed with the certification of any evaluator that "appropriate education" has taken place, including that of the Newborns, never restricted the Newborns' choice of educational materials or curriculum, never questioned their logs or portfolios, and never questioned any of their reading materials, including religious based materials.

###    4.        Nelson v. Titusville Area School District - Civil Action No. 05-070

The school district never questioned the Nelsons about their choice of curriculum or reading materials, which include the Bible, never challenged their home schooling program in any way, never rejected or questioned their portfolios, affidavits or logs, never placed any restrictions on the home schooling program with regard to the religious content of their reading materials or curriculum or otherwise, and the Nelsons never expressed any discomfort about including religious materials in their submissions.  Two of the Nelsons' daughters who are home schooled participate fully in extracurricular activities of the school district.

###    5.        Hankin v. Bristol Township School District - Civil Action 04-1936

The Hankins have seven school children ages 3 to 15, and are members of the Free Presbyterian Church of Malvern, Pennsylvania, who consider their religious beliefs have been substantially burdened by having to comply with Act 169 because, by having to submit to the

authority of an "ungodly" school district, they are sinning in God's eyes. The Hankins have no

particular objections to submitting an affidavit about their home schooling program, about

providing information about their educational curriculum or materials, about providing

information about the children's supervisor, about providing the minimum number of hours in

required courses, or to maintaining the logs, portfolios and affidavits to demonstrate compliance

with Act 169. The school district has never rejected a home education program because of its

use of religious materials and its evaluation of portfolios is unaffected by the inclusion of

religious materials or curricula.

6.       **Combs v. Homer Center School District -- Civil Action No. 04-1599**

The Combs have always included a religious component as part of their home education

program, and the school district has never rejected, disapproved or questioned any of their plans,

rejected any portfolios or affidavits, never prevented or required the teaching of any particular

curriculum or materials, including any religious based curriculum or materials, and has never

interfered with the Combs providing religious education to their children.

D.       **Plaintiffs' Response to Defendants' Concise Statement of Material Facts**

In their consolidated response, there is remarkably little dispute over the material facts.

Plaintiffs concede (or, at a minimum, they do not dispute or offer evidence to counter) the facts

averred in Defendants' consolidated concise statement that none of the school districts ever

interfered with or rejected any of the parents' choice of educational curricula or materials,

including religious based curricula and materials;  none of the school districts ever rejected or

disapproved any of the parents' affidavits, portfolios or logs; none of the school districts ever

rejected or disapproved any of the third party evaluators' certificates of "appropriate education";

none of the school districts ever interfered with any parent's or child's participation in the

sacraments, practice, conduct or exercise of their religious faith; and none of the school districts

ever objected to the teaching of religious instruction as part of any home schooling program.

    Plaintiffs do not concede, however, that the conduct or expression of their religion has not

been substantially burdened by Act 169.  To the contrary, Plaintiffs claim that Act 169 places a

fundamental substantial burden on a central tenet of their religion, namely, that "education is

religion," and that the assertion by the Commonwealth of Pennsylvania of *any* authority over the

education of their children violates their religious principles.  As Plaintiffs state in their brief in

opposition to Defendants' Motion for Summary Judgment:

> As the memorandum opinion [of December 8, 2005 (Document No.
> 84)] correctly points out, the Plaintiffs have each expressed a religious
> belief that "Act 169 places 'authority' over their children's education,
> which, to Plaintiffs, 'is religion,' in secular hands, and that placing of
> authority in any state agency violates their sincerely held religious
> beliefs." *Combs*, 2005, WL 3338885 at *24.  It is also accurate to
> state, as the opinion does, that Plaintiffs believe that "'the Lord has
> established jurisdictional boundaries between the family and the
> State,' that 'subjecting their home education program to the authority,
> oversight and discretionary review of the State violates biblically
> ordained jurisdictional lines between the family and the State.'"

Plaintiffs' Brief In Opposition to Defendants' Motion for Summary Judgment (Document No.

104), at 9.

    In Plaintiffs' view, the requirement that they keep logs and portfolios and submit them to

the school districts is both conduct and expression that violates their religious beliefs, and the

requirement that they submit their home education programs to the school districts for approval

"is tantamount to bowing down before Nebuchadnezzar's golden statute."  Plaintiffs' Brief In

Opposition to Defendants' Motion for Summary Judgment (Document No. 104), at 10.

In summary, there is no material dispute of fact in this case.  There is a dispute, but it is a fundamental philosophical, societal and theological dispute over the authority to educate children in the Commonwealth of Pennsylvania. Thus, the Court finds that there is no dispute that implementation of Act 169 by the Defendant school districts has had no concrete, tangible, discernible impact on the practice, conduct or expression of Plaintiffs' religion.  On the other hand, there also is no dispute that the very *existence* of Act 169, which requires school districts to ascertain that all of its compulsory age children are receiving "appropriate education," is completely antithetical to Plaintiffs' sincerely held religious beliefs that reject any secular authority over the education of their children.

As there are no genuine issues of disputed material facts, the Court will proceed to address and resolve the genuine issues of disputed legal principles, and decide them as a matter of law.

### E.  Summary Judgment Standards

Summary judgment under Fed.R.Civ.P. 56(c) is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Woodside v. School Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001), quoting Foehl v. United States, 238 F.3d 474, 477 (3d Cir.2001) (citations omitted).  In deciding a summary judgment motion, the court must "view the evidence . . . through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the Plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." Anderson v. Consolidated Rail

50

Corp., 297 F.3d 242, 247 (3d Cir. 2002), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

254 (1986).

When the non-moving party will bear the burden of proof at trial, the moving party's

burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there

is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477

U.S. 317, 325 (1986).  If the moving party has carried this burden, the burden shifts to the non-

moving party who cannot rest on the allegations of the pleadings and must "do more than simply

show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co.

v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Petruzzi's IGA Supermarkets, Inc. v. Darling-

Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993). Thus the non-moving party cannot rest on the

pleadings, but instead must go beyond the pleadings and present "specific facts showing that

there is a genuine issue for trial," Fed.R.Civ.P. 56(e), and cannot rely on unsupported assertions,

conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.

Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir.1989) (citing Celotex, 477 U.S. at

325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence

to create material issues of fact concerning every element as to which the non-moving party will

bear the burden of proof at trial." Simpson v. Kay Jewelers, Div. Of Sterling, Inc., 142 F. 3d 639,

643 n. 3 (3d Cir. 1998), quoting Fuentes v. Perskie, 32 F.3d 759, 762 n. 1 (3d Cir. 1994).

"In considering a motion for summary judgment, a district court may not make credibility

determinations or engage in any weighing of the evidence; instead, the non-moving party's

evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.' Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)." Marino v. Industrial Crating Co., 358 F.3d

241, 247 (3d Cir. 2004.)  See also Doe v. County of Centre, PA, 242 F.3d 437, 446 (3d Cir.

2001) (court must view facts in the light most favorable, draw all reasonable inferences, and

resolve all doubts, in favor of the nonmoving party ).


## V.  Discussion of Legal Issues

**A.**     **Pennsylvania Religious Freedom Protection Act**

**1.**     **Canons of Construction**

As far as the Court and parties are aware, the RFPA of 2002 has not been interpreted by

any court in the Commonwealth of Pennsylvania, state or federal, and its applicability and effect

in this case is a matter of first impression.  In interpreting the RFPA, the Court will consider

Pennsylvania's relevant canons of construction, codified at 1 Pa.C.S. §§1900-1978.

All statutory construction of Pennsylvania statutes is guided by the principle that the

canons adopted by the legislature shall be observed, unless the application of such canons would

result in construction inconsistent with the manifest intent of the General Assembly.  1 Pa.

C.S.A. §1901.  The "object of all interpretation and construction of statutes is to ascertain and

effectuate the intention of the General Assembly." 1 Pa. C.S.A. §1921.  This is the primary rule

of statutory construction and all other rules of statutory construction are secondary thereto.

Pennsylvania Human Relations Comm'n v. Alto-Reste Park Cemetery Ass'n, 306 A.2d 881, 885

(Pa. 1973).

Words and phrases used in statutes enacted by the General Assembly are to be construed

according to their common usage, whereas technical words and phrases that have acquired a

peculiar meaning shall be construed to such peculiar definition.  1 Pa. C.S.A. §1903.[16]  When the words of a statute are free from all ambiguity, those provisions are not to be disregarded under the pretext of pursuing its spirit, 1 Pa. C.S.A. §1921;[17] rather, "[w]hen the words of a statute are plainly expressive of an intent, the interpretation must be in accordance therewith." Bradbury v. Wagenhorst, 54 Pa. 180 (1867).  Conversely, when a statutory term is ambiguous on its face, the intention of the General Assembly may be ascertained by considering:

> (1) the occasion and necessity for the statute, (2) the circumstances under which it was enacted, (3) the mischief to be remedied, (4) the object to be attained, (5) the former law, if any, including other statutes upon the same or similar subjects, (6) the consequences of a particular interpretation, and (7) the contemporaneous legislative history, and (8) legislative and administrative interpretations of such statute.

1 Pa. C.S.A. §1921.[18]

Courts shall construe every statute to give effect to all its provisions.  1 Pa. C.S.A.

---

[16] See e.g. Commonwealth  v. Hill, 391 A.2d. 1303, 1306 (Pa. 1973) (emphasis added), ("Language of statute must be construed according to common and approved usage, and where possible it should be interpreted in manner so as to give effect to each and every provision of act."); Commonwealth v. Mumma, 414 A.2d 1026, 1029 (Pa. 1980), ("When interpreting a statute, Supreme Court is guided by the plain meaning rule of construction.").

[17] See e.g. Commonwealth v. Pope, 317 A.2d 887, 889 (Pa. 1974), ("A court may not alter, under the guise of 'construction,' the express language and intent of the legislature."); Commonwealth ex rel. Cartwright v. Cartwright, 40 A.2d 30, 33 (Pa. 1944) ( "When language of statute is plain and unambiguous and conveys clear and definite meaning, there is no occasion for resorting to rules of statutory construction, but statute must be given its plain and obvious meaning, though court may be convinced by extraneous circumstances that legislature intended to enact something very different.").

[18] See e.g. Frontini v. Com. Dept. of Transp., 593 A.2d 410, 412 (Pa. 1991), ("Whenever a court attempts to ascertain the meaning of language within a statute, its goal is to effectuate the intent of the Legislature."); Commonwealth v. Shawell, 191 A. 17, 20 (Pa. 1937), ("In construing an ambiguous statutory term, which is subject to more than one interpretation, court will adopt construction which will effectuate intention of Legislature."); In re Umholtz, 43 A.2d 75, 765 (Pa. 1899) ("Statutes are to be so construed as to best effectuate the intention of the legislature, though such construction may seem contrary to the letter.").

§1921.[19]  Thus, the "language of a statute must be construed, where possible, in a manner so as to give effect to each and every provision of the act." Commonwealth. v. Hill, 391 A.2d. 1303, 1306 (Pa. 1973).

In ascertaining the intention of the General Assembly in enacting a statute, two presumptions may be employed:

> that the General Assembly does not intend to violate the Constitution of the United States or this Commonwealth and (2) that when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statues on the same subject matter intends the same constructions to be placed upon such language.

1 Pa. C.S.A. §1922.[20]

Statutes 'in pari materia' shall be construed together as one statute. 1 Pa. C.S.A. §1932. Statutes are 'in pari materia' when "they relate to the same persons or things or the same class of persons or things."  1 Pa. C.S.A. §1932.  Thus, "[s]tatutes pertaining to the same subject matter are to be considered as one if possible," Girard Sch. Dist. v. Pittenger, 392 A.2d 261, 265 (Pa. 1978), and "in harmony with the existing law, and as part of a general and uniform system of jurisprudence," In re Peplinski's Estate, 29 A.2d 271, 275 (Pa. Super. 1944).  Examples of

---

[19] See e.g. Commonwealth  v. Pope, 317 A.2d 887, 889 (Pa. 1974) ("A statute must be construed, if possible, to give effect to all its provisions, making the entire statute effective and certain.").
[20] See e.g. Evans v. West Norriton Tp. Mun. Auth., 87 A.2d 474, 478 (Pa. 1952) ("An Act of Assembly can be declared void only when it violates constitution clearly, palpably and plainly; and when Act is doubtful, and two constructions are reasonably possible, one of which will render Act unconstitutional and another unconstitutional, court should adopt construction which renders statute constitutional."); Milk Control Comm'n v. Battista, 198 A.2d 840, 843 (Pa. 1964) ("All doubt is to be resolved in favor of sustaining legislation which is sought to be upset on constitutional grounds."); Pennsylvania Liquor Control Bd. v. Spa Athletic Club, 485 A.2d 732, 735 (Pa. 1984) ("Legislation will not be invalidated unless it clearly, palpably, and plainly violates the Constitution, and any doubts are to be resolved in favor of finding of constitutionality.").

statutes that have been construed as in pari materia include: <u>Hamilton v. Unionville-Chadds Ford</u> <u>Sch. Dist.</u>, 714 A.2d 1012, 1015 (Pa. 1998) ("[D]istrict code and the middle school code are 'in pari materia'," because "both portion of the school codes in question relate to disciplinary procedures, and thus involves the same subject matter."); <u>Carroll v. Ringgold Edu. Ass'n</u>, 680 A.2d 1137, 1141 (Pa. 1996) ("Public Employee Relations Act is to be read 'in pari materia' with the addition of Article XI-A of the Public School Code, but PERA is repealed insofar as it is clearly inconsistent with the addition of Article XI-A of the Act."); <u>Girard Sch. Dist. v. Pittenger</u>, 392 A.2d 261, 265 (Pa. 1978) ("Sections 510 et al. of the School Code and the statement of the State Board on Student Rights and Responsibilities should, in fact, be considered as 'in pari materia.'"); <u>Barret v. Com., Dept. of Ed.</u>, 414 A.2d 763 (Pa. Commw. Ct. 1980) ("Article XI and Article XIX of the Public School Code were enacted contemporaneously, and 24 P.S. §19-1926, makes specific reference to the employment rights set out in Article XI. These provisions are therefore 'in pari materia' and must be construed together if possible.").  Statutes 'in pari materia' should be considered concurrently and, whenever possible, effect should be given to both.  <u>First Nat'l Bank of Millville v. Horwatt</u>, 162 A.2d 60, 62 (Pa. Super. 1960).

### 2.    Interpretation of the RFPA - Plaintiffs' Initial Burden of Proof

The RFPA is not ambiguous as to the issues raised in this case.  It defines key terms in plain language and it lays out the respective burdens of proof.

As Plaintiffs acknowledge, it is incumbent upon them to first demonstrate, by clear and convincing evidence, that Act 169 imposes a "substantial burden" by compelling conduct or expression that violates a specific tenet of their religious faith. 71 Pa. Stat. Ann. §2402(4).  This is the only one of the four "substantial burdens" defined by the RFPA that Plaintiffs are claiming.

Before a state agency will be held to its burden of proving a compelling state interest and that there are no less restrictive means to further that interest, Plaintiffs must pass the "substantial burden" threshold.  71 Pa. Stat. Ann. §§2404, 2405(f).

Assuming all the averments in Plaintiffs' complaint and statements of fact are true, and giving them the benefit of all reasonable inferences, they cannot show that Act 169, on its face, burdens their exercise of religion at all, let alone substantially.  As noted, all of the Plaintiffs have home schooled their children for five to thirteen years before mounting this statutory and constitutional challenge to Act 169, yet they are unable to identify any specific, concrete, direct (or indirect) effects on the practice or exercise of their religion.  There is nothing in the language of Act 169 which restricts the practice of religion, nor in the regulations developed by the PDE, although the statute and the regulations take some care to accommodate religious concerns.

Since Pennsylvania's General Assembly enacted the RFPA to restore the traditional free exercise test -- strict scrutiny, compelling interest, less restrictive means  -- that existed prior to the Smith case, it is appropriate and informative to examine the Free Exercise Clause jurisprudence on the meaning of "substantial burden" and precedent interpreting that phrase in the context of other religious freedom restoration legislation.  Construing "substantial burden" as used in the federal Religious Freedom Restoration Act before it was declared unconstitutional as applied to the states, the United States District Court for the District of Maryland stated:

A "substantial burden" exists in the Constitutional sense when governmental action compels a party to affirm a belief they do not hold, discriminates against an individual or group because of religious belief, inhibits the dissemination of particular religious views, or pressures a party to forego a religious practice. Sherbert v. Verner, 374 U.S. 398, 402-404 (1963) (collecting cases).

Battles v. Anne Arundel County Bd. of Educ., 904 F.Supp. 471, 476-77 (D.Md. 1995).

In Levitan v. Aschroft, 281 F.3d 1313, 1320 (D.C. Cir. 2003), the United States Court of

Appeals for the District of Columbia Circuit held that "the First Amendment is implicated when

a law or regulation imposes a substantial, as opposed to inconsequential, burden on the litigant's

religious practice. Our cases make clear that this threshold showing must be made before the

First Amendment is implicated.  See Branch Ministries v. Rossotti, 211 F.3d 137, 142 (D.C.Cir.

2000) (holding that, to sustain its claim under either the Constitution or RFRA, a Plaintiff must

first establish that its free exercise right has been substantially burdened)." The Levitan Court

listed several factors to consider in determining whether a Plaintiff has met his or her

"impingement threshold" as follows:

> The litigant's beliefs must be sincere and the practices at issue must be
> of a religious nature. See Church of the Lukumi Babalu Aye, Inc. v.
> City of Hialeah, 508 U.S. 520, 531 (1993). The challenged rule must
> also burden a central tenet or important practice of the litigant's
> religion.
>
> We are mindful of the Supreme Court's warning that judging
> the centrality of different religious practices is akin to "the
> unacceptable 'business of evaluating the relative merits of differing
> religious claims.' " Smith, 494 U.S. at 887 . . . . Nonetheless, it is
> sometimes the case that litigants can make no credible showing that
> the affected practice is either central or important in their religious
> scheme. See Henderson, 253 F.3d at 17. In such cases, the de minimis
> burden imposed by the challenged law is not constitutionally
> cognizable. Id. In other cases, in which the practice at issue is
> indisputably an important component of the litigants' religious
> scheme, such evidence may be relevant to overcome any claim that
> the impact of the challenged law is de minimis. Moreover, a rule that
> bans a practice that is not "central" to an adherent's religious practice
> might nonetheless impose a substantial burden, if the practice is
> important and based on a sincere religious belief.
>
> A court may also consider whether the litigants' beliefs find
> any support in the religion to which they subscribe, or whether the
> litigants are merely relying on a self-serving view of religious
> practice. This inquiry is not a matter of deciding whether appellants'
> beliefs accord in every particular with the religious orthodoxy of their

church. See Smith, 494 U.S. at 887, 110 S.Ct. at 1604 (holding that courts should not question the "validity of particular litigants' interpretations" of their creeds) . . . . Nor is it a matter of adjudicating intrafaith differences in practice or belief. . . . Instead, a court may determine whether the litigants' views have any basis whatsoever in the creed or community on which they purport to rest their claim. For example, a Catholic litigant who asserted that it was part of his religion to wear sunglasses would be making a claim "so bizarre . . . as not to be entitled to protection" under the First Amendment. [Thomas v. Review Bd. of the Ind. Employment Sec. Div., 450 U.S. 707, 715 (1981)]. The litigant's assertion of a view so totally foreign to the creed with which he claimed to affiliate might well lead the court to question his sincerity. It is therefore unlikely that a litigant challenging a rule limiting his right to wear sunglasses could satisfy the threshold requirement.

Levitan, 281 F.3d at 1320-21 (parallel and certain other citations omitted).  See also Branch Ministries, 211 F.3d at 142-44 (collecting tax burden cases where burden on religious institutions from imposition of taxes is deemed incidental, and not substantial, for Free Exercise purposes); Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston, 250 F.Supp.2d 961, 991 (N.D. Ill. 2003) ("The history of the [federal RLUIPA] statute demonstrates that Congress did not intend to change traditional Supreme Court jurisprudence on the definition of substantial burden. . . . 'Substantial burden' has been defined or explained in various ways" and it exists where, for instance, the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs; the state forces a person to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning the precepts of her religion on the other; or the "government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden," quoting Jimmy Swaggart Ministries v. Bd. of Equalization, 493 U.S. 378, 384-85 (1990) (numerous citations omitted)).

58

Under the Pennsylvania RFPA, a person claiming a "substantial burden" must notify the offending state agency of the "manner in which the exercise of the governmental authority burdens the person's free exercise of religion." 71 Pa. Stat. Ann. §2405(b)(3). The RFPA defines "substantial burden" as agency action which (1) <u>significantly constrains or inhibits conduct or expression</u> mandated by a person's sincerely held religious beliefs; (2) <u>significantly curtails a person's ability to express adherence</u> to the person's religious faith; (3) <u>denies</u> a person a reasonable opportunity <u>to engage in activities</u> which are fundamental to the person's religion; or (4) compels <u>conduct or expression</u> which violates a specific tenet of a person's religious faith. 71 Pa. Stat. Ann. §2403(4). The burdens contemplated by section 2403 are not abstract or theoretical; they are, instead, restrictions or impairments on a person's ability to exercise, practice, express or act in conformity with their religious beliefs. Similarly, the burdens contemplated by section 2403 concern the negative impact on one's religious exercise, practice, expressions and conduct, not "secular" concerns such as the parents' health and expenditures of time and energy.

Viewing the RFPA as a whole, according to the plain meaning of all of its terms and in accordance with the canons of construction, and considering the foregoing analysis of "substantial burden" in the context of Free Exercise Clause and similar freedom of religion restoration acts, and mindful of the General Assembly's intention to restore the traditional (pre-<u>Smith</u>) free exercise of religion standards, this Court holds that a Plaintiff challenging legislation or agency action under the Pennsylvania RFPA must meet the threshold burden of showing, by clear and convincing evidence, that there is or will be denial or <u>substantial</u> infringement of <u>conduct or expression</u> which violates a specific tenet of his or her religious faith, not simply that

59

the legislation or agency action has some *de minimus*, tangential or incidental impact or is at odds with their religious beliefs.

As will be explained more fully in the Court's discussion of the First Amendment- Free Exercise jurisprudence, Plaintiffs cannot show that Act 169, on its face, places <u>any</u> restriction on or infringement of the <u>practice</u> or <u>exercise</u> of their religion, but only that it interferes with their sincerely held religious <u>beliefs</u> that "education is religion" and that the state has <u>no authority</u> to regulate home education programs by such religiously motivated home schoolers.  Further, Plaintiffs have not produced any evidence to demonstrate that, <u>as applied in practice</u>, one or more of the Defendant school districts or superintendents applies Act 169 in such a way as to restrict or infringe upon their religious practice or exercise.

**B.     First Amendment - Free Exercise Clause**

**1.     Overview**

As rehearsed, <u>Employment Div., Dep't of Human Resources of Oregon v. Smith</u> signaled a significant change in the First Amendment - Free Exercise Clause analysis of legislation claimed to infringe on the exercise of religion, in holding that the right of free exercise of religion does not relieve an individual of the obligation to comply with a "valid and neutral law of general applicability" on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).  Under current practice, a law ordinarily need not be justified by a compelling interest if it is "neutral" in that it is not targeted at religiously motivated conduct and "generally applicable" in that it does not selectively burden religious conduct.  <u>See Church of Lukumi Babalu Aye, Inc. v. Hialeah</u>, 508 U.S. 520, 532-35 (1993).

It is apparent that Act 169 is a neutral law of general applicability to all Pennsylvania

60

home schoolers and their home education programs, with no reference or special impact on religious practices, and Plaintiffs do not claim otherwise.  What they claim, however, is that this legislation should be reviewed under the pre-<u>Smith</u> framework because it presents the "hybrid rights" exception recognized in the <u>Smith</u> case, as gleaned from the <u>Meyer</u>, <u>Pierce</u> and <u>Yoder</u> cases, since Act 169 implicates <u>both</u> the free exercise of their religion <u>and</u> another constitutionally protected fundamental right, namely the right of parents to educate their children and participate in their upbringing.

Most of the United States Circuit Courts of Appeals to address this issue have concluded that, even if the Supreme Court would explicitly recognize a "hybrid rights" exception, as their dictum in the <u>Smith</u> case suggests, laws regarding compulsory attendance and home schooling do not fall within that narrow exception; in other words, the Courts of Appeals have concluded that the parental rights in the education of their children, as important as they are, do not automatically place all parents in the <u>Meyer</u>, <u>Pierce</u> and <u>Yoder</u> class.

2.      **Parental Rights -- <u>Meyer</u>, <u>Pierce</u> and <u>Yoder</u> – Hybrid Rights**

The <u>Meyer</u>, <u>Pierce</u> and <u>Yoder</u> trilogy of Supreme Court cases is the genesis of Plaintiffs' argument that government action which both infringes their free exercise of religion or other constitutional rights, <u>and</u> interferes with the rights of parents to choose the manner of education for their children and control their upbringing, must be subject to heightened scrutiny because such action impacts "hybrid rights."

It is well established that the fundamental right of parents to direct the upbringing and education of their children is protected by the Due Process Clause of the Fourteenth Amendment. <u>Troxel v. Granville</u>, 530 U.S. 57, 65 (2000) (recognizing that a parent's due process right in the

61

care, custody, and control of her children is "perhaps the oldest of the fundamental liberty

interests recognized by [the Supreme] Court," and striking down Washington law giving

grandparents rights of access to children in conflict with mother's parental rights); Wisconsin v.

Yoder, 406 U.S. 205, 232 (1972) (finding that ""primary role of the parents in the upbringing of

their children is now established beyond debate as an enduring American tradition," and holding

that Wisconsin could not compel Amish children to attend school beyond the age of 14);  Pierce

v. Society of Sisters, 268 U.S. 510, 534-35 (1925) (striking down Oregon law that required

parents to send their children to a public school, rather than Roman Catholic parochial school, for

a period of time because it "unreasonably interferes with the liberty of parents and guardians to

direct the upbringing and education of children under their control"); Meyer v. Nebraska, 262

U.S. 390, 400 (1923) (recognizing the right of "the parent to give his children education suitable

to their station in life," including right to provide education in the family's language, German).

However, while the "precise boundaries of a parent's right to control a child's upbringing and

education" are not fully delineated, it is "clear  . . . that the right is neither absolute nor

unqualified."  C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 182 (3d Cir. 2005).

    In the Yoder case, the United States Supreme Court stated:

> [T]he First and Fourteenth Amendments prevent the State from
> compelling respondents to cause their children to attend formal high
> school to age 16. Our disposition of this case, however, in no way
> alters our recognition of the obvious fact that courts are not school
> boards or legislatures, and are ill-equipped to determine the 'necessity'
> of discrete aspects of a State's program of compulsory education. This
> should suggest that courts must move with great circumspection in
> performing the sensitive and delicate task of weighing a State's
> legitimate social concern when faced with religious claims for
> exemption from generally applicable education requirements. It
> cannot be overemphasized that we are not dealing with a way of life

and mode of education by a group claiming to have recently
discovered some 'progressive' or more enlightened process for rearing
children for modern life.

406 U.S. at 234-35 (footnote omitted; emphasis added).

The Amish parents in the <u>Yoder</u> case demonstrated a "history of three centuries as an identifiable religious sect and a long history as a successful and self-sufficient segment of American society," the interrelationship of their religious beliefs with their daily life, "the vital role that belief and daily conduct play in the continued survival of Old Order Amish communities and their religious organization, and the hazards presented by the State's enforcement of a statute generally valid as to others." <u>Id.</u> at 235.  Moreover, the parents made a "convincing showing, one that probably few other religious groups or sects could make," that the alternatives offered by the state would be completely inadequate to preserve their religious way of life.  <u>Id</u>.  Still, the Court cautioned that its holding was not intended "to undermine the general applicability of the State's compulsory school-attendance statutes or to limit the power of the State to promulgate reasonable standards that, while not impairing the free exercise of religion, provide for continuing agricultural vocational education under parental and church guidance by the Old Order Amish or others similarly situated."  <u>Id</u>.

And in the <u>Pierce</u> case, the United States Supreme Court stated there is no "general power of the state to standardize its children by forcing them to accept instruction from public teachers only," that children are not mere creatures of the state, and that "those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." 268 U.S. at 534.  Nevertheless, the Court explicitly stated:

No question is raised concerning the power of the state reasonably to

> regulate all schools, to inspect, supervise and examine them, their
> teachers and pupils; to require that all children of proper age attend
> some school, that teachers shall be of good moral character and
> patriotic disposition, that certain studies plainly essential to good
> citizenship must be taught, and that nothing be taught which is
> manifestly inimical to the public welfare.

Id. at 573.

In <u>Runyon v. McCrary</u>, 427 U.S. 160 (1976), the Supreme Court held that, while it can be assumed that "parents have a First Amendment right to send their children to educational institutions that promote the belief that racial segregation is desirable, and that the children have an equal right to attend such institutions," it does not follow that such private institutions can deny black children admission solely on the basis of race in defiance of civil rights legislation. The Court easily distinguished the <u>Meyer</u>, <u>Pierce</u>, <u>Yoder</u> line of cases, observing that it "has repeatedly stressed that while parents have a constitutional right to send their children to private schools and a constitutional right to select private schools that offer specialized instruction, they have <u>no constitutional right to provide their children with private school education unfettered by reasonable government regulation</u>." <u>Runyon</u>, 427 U.S. at 178. And in <u>Bd. of Educ. v. Allen</u>, 392 U.S. 236 (1968), the Court held that neither the Establishment Clause nor the Free Exercise Clause prohibited the state from loaning textbooks to students attending parochial schools, remarking that the <u>Pierce</u> decision did not "question Oregon's power to compel school attendance or require that the attendance be at an institution meeting State-imposed requirements as to quality and nature of curriculum," and that since that decision, "a substantial body of case law has confirmed the power of the States to insist that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of

instruction, employ teachers of specified training, and cover prescribed subjects of instruction. Indeed, the State's interest in assuring that these standards are being met has been considered a sufficient reason for refusing to accept instruction at home as compliance with compulsory education statutes."  392 U.S. at 245-47, citing with approval, People v. Turner, 263 P.2d 685, 687 (Cal. Superior Ct., App. Div. 1953), appeal dismissed for want of substantial federal question, 347 U.S. 972 (1954).

The Turner case upheld a California statute requiring parents to place their children in public schools, a private school meeting certain prescribed conditions, or by private tutor or other person possessing requisite qualifications in the manner prescribed by statute. Home schooling parents who did not meet qualifications challenged the statute as infringing on their parental rights to educate their children, relying on the Meyer, Pierce, Yoder triology.

Rejecting the home schooling parents' argument that the statute deprived them of the right to determine how and where their children may be educated, the Superior Court, Appellate Division held:

> There can be no doubt that if the statute, without qualification or exception required parents to place their children in public schools, it would be unconstitutional .  .  .  .  The statute here, however, unlike that involved in the case cited, does not so provide. It recognizes the right of parents not to place their children in public schools if they elect to have them educated in a private school or through the medium of a private tutor or other person possessing certain specified qualifications. We see no basis therefore upon which to predicate a holding of unconstitutionality unless such a holding is compelled because the statute denies the right of parents [who do not meet statutory qualifications] to educate their children .  .  .  . Contrary to the contention of the Defendant, we see nothing in the Pierce case so declaring or intimating.

> *   *   *

65

It is not without significance that, although it has been said that 'only eleven of the forty-eight states permit by statute that instruction may be given at home by their parent or tutor,' and 'such home instruction moreover is specifically conditioned except in two states' (Parental Right in Educational Law, Loughery, Catholic University of America Press, 1952), we have been unable to find a single case in which it has been held that so-called compulsory attendance statutes are rendered unconstitutional and void merely by reason of a failure to recognize home instruction as an alternative to attendance in the public schools.

Turner, 263 P.2d 865-67.

The several United States Circuit Courts of Appeals to have considered the matter all have rejected the argument that a state's restrictions on protected parental rights in the upbringing and education of their children, ala Meyer, Pierce, Yoder, even when combined with a free exercise of religion, due process or some other constitutional challenge, elevates their challenge to a Smith "hybrid rights" claim, or otherwise triggers heightened scrutiny.  See, e.g., Crowley v. McKinney, 400 F.3d 965 (7th Cir. 2005) (non-custodial parent's rights to participate in his child's education plus free speech and equal protection claims did not trigger "hybrid rights" strict scrutiny nor trump state's interests in regulating public school education); Littlefield v. Forney Indep. Sch. Dist., 268 F.3d 275 (5th Cir. 2001) (uniform policy, even assuming that it regulated expressive conduct entitled to constitutional protection, did not violate students' First Amendment's free speech rights, did not implicate parents' fundamental due process right in the upbringing and education of their children, and was justified by a rational basis; and its opt-out procedure, which required parents with bona fide religious or philosophical objections to apply for exemption by filling out questionnaire designed to gauge the sincerity of their beliefs, did not violate free exercise and establishment clauses of First Amendment); Hooks v. Clark County

66

Sch. Dist., 228 F.3d 1036 (9th Cir. 2000) (assuming parents have a constitutional right to educate children at home pursuant to Meyer, Pierce, Yoder, they do not have a constitutional right to state-funded speech therapy services provided to private or public schooled children; states have discretion to determine whether home education qualifies as a "private school," and the school district's refusal of IDEA services to home schoolers did not violate due process); Swanson v. Guthrie Indep. Sch. Dist. No. 1-L, 135 F.3d 694 (10th Cir. 1998) (parents had no constitutional right "to send their children to public school on a part-time basis, and to pick and choose which courses their children will take from the public school," upholding school district's full-time attendance policy against Meyer, Pierce, Yoder parental rights and free exercise of religion challenge, and rejecting attempt to claim "hybrid rights" status); Herndon v. Chapel Hill-Carrboro City Bd. of Educ., 89 F.3d 174  (4th Cir. 1996) (upholding school district's mandatory community service program against Meyer, Pierce, Yoder parental rights, due process and involuntary servitude challenge); Leebaert v. Harrington, 332 F.3d 134 (2d Cir. 2003) (parent's challenge to mandatory health education curriculum on religious grounds was subject to rational basis, rather than strict scrutiny, review, and did not command strict scrutiny merely because it invoked "hybrid rights," i.e., Meyer, Pierce, Yoder parental rights claim and other constitutional provisions in addition to free exercise clause);  Brown v. Hot, Sexy & Safer Prods., Inc., 68 F.3d 525 (1st Cir. 1995) (upholding compulsory high school sex education assembly program against parents' challenges that sexually explicit AIDS awareness assembly violated privacy rights and right to rear children ala Meyer, Pierce, Yoder, due process, free exercise clause and right to educational environment free from sexual harassment).  See also Kissinger v. Bd. of Trustees of the Ohio State Univ., Coll. of Veterinary Med., 5 F.3d 177 (6th Cir. 1993)

(where free exercise of religion combined with various other First Amendment claims, the Court of Appeals for the Sixth Circuit explicitly rejected the more stringent "hybrid rights" legal standard suggested by the dictum in <u>Smith</u>, explaining that it did not see how a state regulation would violate the Free Exercise Clause if it implicates other constitutional rights but would not violate the Free Exercise Clause if it did not implicate other constitutional rights).

The United States Court of Appeals for the Third Circuit has not explicitly decided that it would apply heightened scrutiny to "hybrid rights" challenges, but has suggested, in dictum, that a form of strict scrutiny analysis might be appropriate in a "hybrid rights" situation. <u>Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly</u>, 309 F.3d 144 (3d Cir. 2002).  The Court of Appeals applied the <u>Smith</u> test, stating that if "a law is 'neutral' and 'generally applicable,' and burdens religious conduct only incidentally, the Free Exercise Clause offers no protection." <u>Id</u>. at 165.  In a footnote, the Court observed that strict scrutiny "may also apply when a neutral, generally applicable law incidentally burdens rights protected by 'the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press, or the rights of parents . . . to direct the education of their children,' <u>Smith</u>, 494 U.S. at 881, 110 S.Ct. 1595 (citations omitted), but the Plaintiffs do not assert such a 'hybrid rights' claim." 309 F.3d at 165 n. 26.  At least one district court within the Third Circuit has, not unreasonably, read this dictum in <u>Tenafly</u> as indicating the Court of Appeals for the Third Circuit will recognize and apply the "hybrid rights" heightened scrutiny analysis. <u>Green v. Philadelphia</u>, 2004 WL 1170531, *7 (E.D.Pa. 2004).

Late last year, the Court of Appeals for the Third Circuit upheld the authority of the state

and/or its school boards to request,[21] in the immediate aftermath of the Columbine massacre, that

students fill out detailed but anonymous surveys regarding the public school students' views on a

host of personal matters, including sex, drug use and suicidal or antisocial behavior, against a

challenge by parents that such survey violated parents' and students' Due Process right to privacy

and First Amendment right against compelled expression, and parents' Due Process right to

participate and control the upbringing and education of their children.  C.N. v. Ridgewood Bd. of

Educ., 430 F.3d 159 (3d Cir. 2005) ("Courts have held that in certain circumstances the parental

right to control the upbringing of a child must give way to a school's ability to control curriculum

and the school environment. "), citing with approval Swanson v. Guthrie Indep. Sch. Dist. and

Brown v. Hot, Sexy and Safer Prods., Inc., inter alia.  See also  Parents United for Better Schools,

Inc. v. Sch. Dist. of Philadelphia Bd. of Educ., 148 F.3d 260 (3d Cir. 1998) (court applied

rational basis test to parents' challenge to school district's program for prevention of sexual

disease raising parental rights in conjunction with other constitutional claims, although parents

apparently did not raise, and Court did not address, "hybrid rights" theory).

     This Court need not and does not decide whether the Court of Appeals for the Third

Circuit would explicitly incorporate a "hybrid rights" exception into its Free Exercise Clause

analysis.  As the preceding discussion shows, even where "hybrid rights" is recognized as a

viable theory, Plaintiffs herein do not qualify for its application, so the general rule announced in

the Smith case would prevail.  Therefore, measuring Plaintiffs' First Amendment Free Exercise

challenge to Act 169 under the Smith rational basis test, Act 169 passes constitutional muster as

---

[21] Ostensibly, completion of the survey was to be voluntary, but the Court of Appeals agreed with the parents claim that, in practice, there was at least some coercion to fill out the forms, but that did not alter the Court's determination.

a neutral law of general applicability and effect.

Even if this Court were to apply a "hybrid rights" heightened or strict scrutiny test, however, Plaintiffs' free exercise challenge to Act 169 on its face would still fail. Every court to have considered similar challenges by parents of home schoolers to compulsory attendance laws and various regulations by school boards and districts prior to 1990, under the pre-<u>Smith</u> strict scrutiny regime, concluded <u>either</u> that the parents had not demonstrated a substantial burden, <u>or</u> that the state had presented compelling interests justifying such burden. <u>See, e.g.</u>, <u>New Life Baptist Academy v. Township of East Longmeadow</u>, 885 F.2d 940 (1st Cir. 1989) (state's procedural requirements of religious schools designed to ensure adequate education is taking place does not violate Free Exercise or Establishment Clauses of First Amendment; collecting numerous pre-<u>Smith</u> cases and distinguishing <u>Yoder</u>; opinion by Breyer, J.); <u>Mazanec v. North Judson-San Pierre Sch. Corp.</u>, 798 F.2d 230 (7th Cir. 1986);  <u>Murphy v. State of Arkansas</u>, 852 F.2d 1039 (8th Cir. 1988) (applying strict scrutiny, Arkansas Home Schooling Act did not violate Free Exercise Clause of First Amendment; distinguishing <u>Yoder</u>); <u>Blackwelder v. Safnauer</u>, 689 F.Supp. 106 (N.D.N.Y. 1988) (applying strict scrutiny, New York's Home Schooling Act did not violate Free Exercise or Establishment Clauses of First Amendment or Due Process Clause of Fourteenth Amendment; collecting numerous cases and finding compelling state interests in such regulations); <u>State of Ohio v. Schmidt</u>, 505 N.E.2d 627 (Ohio 1987) (applying strict scrutiny, Ohio's Home Schooling Act did not violate Free Exercise Clause of First Amendment; collecting numerous cases and finding compelling state interests in such regulations); <u>Care and Protection of Charles</u>, 504 N.E.2d 592 (Mass. 1987) (applying strict scrutiny, Massachuset's Home Schooling Act did not violate Free Exercise Clause of First Amendment; collecting

70

numerous cases and finding compelling state interests in such regulations).

States have employed a variety of techniques and procedural requirements of different intensity in crafting home education programs that would permit home schoolers to satisfy compulsory education laws and ensure that the students were receiving adequate education. Where a court has reached the compelling state's interests and less restrictive means portions of the test, the burden on parental rights in this context routinely has been found to be justified, as the above cited cases amply illustrate.

For all of the foregoing reasons, this Court reaffirms the denial of Plaintiffs' Motion for Summary Judgment as to their "facial" challenge to Act 169 as a violation of their right to freely exercise their religion, and will grant Defendants' Motion for Summary Judgment as to Plaintiffs' "as applied" challenges.

### C.    Remaining Constitutional Challenges

The Court will also grant summary judgment for Defendants on Plaintiffs' remaining constitutional challenges to Act 169 -- that it violates the Establishment Clause of the First Amendment; several aspects of the Due Process Clause of the Fourteenth Amendment; and the Free Speech Clause of the First Amendment (including their right to resist "compelled speech"). As Plaintiffs' position as stated in two rounds of summary judgment manifests, these consolidated cases are principally about the RFPA and the Free Exercise Clause of the First Amendment. The cases discussed in the preceding section illustrate that each of Plaintiffs' additional constitutional claims are frequently joined with free exercise claims in the parental rights - compulsory education arena, and the analysis and resolution of the claims substantially overlap. Those additional challenges fare no better in the parental rights - compulsory education

71

arena than do their free exercise claims.  Accordingly, the Court will not elaborate its rulings on these additional challenges, and will grant summary judgment in favor of Defendants on Plaintiffs' remaining constitutional claims.

## VI. Summary

### A.  The Summary Judgment Rulings

Defendants assert, and offer documentary and testimonial evidence to support, that none of the school districts have ever rejected a home schooling plan for including or emphasizing religious education, or interfered with the education of the home schooling children in this case, whether religious based or secular; none of the school districts have ever required particular educational texts and materials, disapproved of any texts or materials actually used, such as Bibles, disapproved any portfolio submitted by any of the Plaintiffs, or interfered in any way with the choice of educational texts and materials to be used at home;  none of the school districts have ever interfered or attempted to regulate or oversee any of the children's or parents' religious practices, such as participation in the observance of sacraments and other customs; none of the school districts have ever rejected or disqualified any certifications by a home schooling third party evaluator (as some of the parents use) that "appropriate education" has taken place because of the evaluator's religious affiliation or beliefs, nor have any of the school districts ever disapproved of the "appropriate education" certification of any of the Plaintiffs' chosen evaluator.

Plaintiffs concede these undisputed facts, but nevertheless maintain that the school districts' insistence on compliance with Act 169 has imposed a substantial burden on their religion, and has infringed upon their other constitutional and statutory rights.  Plaintiffs assert

that Defendant school districts substantially burden their religious practices because the mere fact of regulating the education of their children transgresses parents' "Biblical jurisdiction" over education, as commanded by God, requiring them to violate their religious beliefs and sin in the eyes of The Lord.

Plaintiffs' Memorandum in Opposition to Summary Judgment (Document No. 104) does not attempt to state a case that the implementation of Act 169 by Defendant school districts causes actual, tangible interference with any religious practice or infringes upon their conduct or exercise of religion in any way. Instead, Plaintiffs candidly admit that they "write only to respectfully address our specific disagreements with the [December 8, 2005] memorandum opinion's analysis with respect to the issue of 'substantial burden.'" Plaintiffs' Memorandum in Opposition to Summary Judgment (Document No. 104) at 1-2.

Framed in those terms, all of Plaintiffs' challenges to Act 169 and its implementation by Defendant school districts must fail. After full and adequate opportunity to take depositions and gather evidence to  develop the record, Plaintiffs still have not shown that Act 169, either "on its face" or "as applied," places <u>any</u> restriction on or infringement upon the <u>practice</u> or <u>exercise</u> of their religion, but <u>only</u> that it interferes with their sincerely held religious <u>beliefs</u> that "education is religion" and that the state has <u>no authority</u> to regulate home education programs by such religiously motivated home schoolers. As discussed above at length, this does not constitute a burden, let alone a substantial one, on the freedom to practice their religion, and so the Plaintiffs fail to meet their threshold burdens under the RFPA or the First Amendment. Accordingly, the Court will grant summary judgment in favor of the Defendants and against Plaintiffs, and an appropriate order will be entered.

**B.  Role of Judiciary**

Although parents and guardians have the primary and crucial role in the upbringing of

and choice of education for their children, the state has a secondary, yet substantial, role to play,

and has since the founding of our Nation.  The Pennsylvania Constitution has provided for public

education since 1776, and currently directs the General Assembly to "provide for the

maintenance and support of a thorough and efficient system of public education to serve the

needs of the Commonwealth."  Pa. Const., Art. III, § 14.

Implementing its constitutional mandate, the Pennsylvania General Assembly has created

a system of public education and compulsory attendance, and has authorized four alternative

means of satisfying the compulsory attendance law, including under Act 169, Pennsylvania's

Home Schooling Act.  Act 169 does not require or prohibit any particular content in textbooks,

courses, curriculum or other educational materials, but merely requires instruction for a

minimum amount of time and days, in certain specific courses deemed necessary by the

legislature, with procedures for demonstrating compliance.

While it may be true, as Plaintiffs herein argue, that other states have no procedures

concerning home schoolers or simpler and less time consuming procedures for home schooling

parents and guardians to provide the necessary assurances of adequate education to the state, it is

not the role of the judiciary to substitute its judgment, or the judgment of elected or non-elected

officials of other states, for the wisdom of the elected legislative body who crafted the procedures

for the Commonwealth of Pennsylvania.  In fact, the Pennsylvania General Assembly has

accommodated home schooling parents by statute, subject to statutory requirements, thus

ensuring that home schooling would satisfy the Compulsory Attendance Law even over possible

objections by local school board, school administrator or the PDE.  Further, the Pennsylvania RFPA is always available to parents and guardians should any local school board, school administrator or the PDE attempt to regulate educational content, textbooks, curriculum and instructional materials on the basis of religious content, or otherwise attempt to apply or interpret Act 169 in a manner that impacts the exercise, practice, conduct or expression of religion.  On the record before the Court, however, there is no evidence that any school district or administrator has acted in such a manner.

This Court should not function as a super school board, questioning the effectiveness of the procedures crafted by the duly elected representatives of the citizens of Pennsylvania, nor may the Court substitute its opinion for the collective wisdom of the General Assembly as to what is "appropriate education" or what are the best procedures to achieve the constitutional mandate of providing a thorough and efficient system of public schools.  Those decisions are within the legislative prerogative.  This Court's role is, instead, the substantially more circumscribed one of measuring the decisions made by the legislature against the protections afforded by the Constitution of the United States and by governing statutes.

For the reasons set forth above, this Court finds that Act 169 does not, on its face, violate the Free Exercise, Establishment, or Free Speech Clauses of the First Amendment to the Constitution of the United States, the Due Process Clause of the Fourteenth Amendment, or the Pennsylvania Religious Freedom Protection Act, and that Plaintiffs have not offered any evidence to support their claims that implementation of Act 169 "as applied" to their home education programs infringe those rights.

<u>s/ Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge

cc: All Counsel of Record